**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

RODRICUS CRAWFORD; KHASIAH
CRAWFORD, a minor child, by and
through her father, RODRICUS
CRAWFORD,

     Plaintiffs,

VERSUS

CADDO PARISH CORONER'S
OFFICE; CORONER TODD G.
THOMA, M.D.; JAMES TRAYLOR,
M.D.; CADDO PARISH DISTRICT
ATTORNEY'S OFFICE; JAMES
STEWART, CADDO PARISH
DISTRICT ATTORNEY;
SHREVEPORT FIRE DEPARTMENT;
SHARON SULLIVAN; DANIEL
MARS; DALE COX; J. DOES #1-99;
ABC INSURANCE COMPANIES #1-
10,

     Defendants.

*********************************

Docket No.

## COMPLAINT

Rodricus Crawford (hereinafter, "Mr. Crawford") and his minor child Khasiah Crawford file this Complaint based on Defendants' violations of Mr. Crawford's rights to a fair trial, the denial of liberty, and to be free from punishment without the due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution.  Mr. Crawford was convicted and sentenced to death based upon false evidence as a result of the failure of Defendants to conduct an unbiased autopsy based on professional standards of practice, and to properly train and supervise prosecutors in Caddo Parish.  Because of the lack of training and supervision and adherence to professional standards, the prosecution was illegally based upon both race and religion, and a complete indifference to the evidence.  In addition, Mr. Crawford raises state law negligence and

intentional infliction of emotional distress claims; but for the reckless and willful conduct of Defendants, Mr. Crawford would not have been prosecuted let alone convicted of capital murder. Defendants knowingly participated in the investigation, arrest and capital prosecution driven by Caddo Parish, Louisiana's well-known history of racism and the arbitrary application of the death penalty.  But for Defendants' actions, no prosecution and conviction of Mr. Crawford would have occurred.    Mr. Crawford requests a jury trial.

In support of these claims, Rodricus and Khasiah Crawford (hereinafter, "Plaintiffs") show as follows:

## I.    JURISDICTION

### 1.

This action is brought through 42 U.S.C. § 1983, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.  In addition, Plaintiffs invoke supplemental jurisdiction over claims under state law pursuant to 28 U.S.C. §1367.

## II.    PARTIES

### 2.

**RODRICUS CRAWFORD** is an African-American male person of full age of majority and a resident of Louisiana.   As the result of Defendants' unconstitutional, negligent, and intentional acts, Mr. Crawford spent 4 years, 9 months, and 6 days illegally in custody.

### 3.

**KHASIAH CRAWFORD** is the minor child of Mr. Crawford and appears through her father, who is a person of the full age of majority and a resident of Louisiana.

Named Defendants herein are:

4.

**CADDO PARISH CORONER'S OFFICE** (hereinafter, "CORONER'S OFFICE") is a political entity capable of suing and being sued.  The CORONER'S OFFICE is responsible for conducting investigations into the cause and manner of death in all cases involving certain categories of deaths in Caddo Parish, Louisiana.  In addition, Louisiana law provides discretion to the coroner to perform an autopsy "in any case in his discretion."

5.

**CORONER TODD G. THOMA, M.D.** (hereinafter, "DR. THOMA") is a person of full age of majority and a resident of Louisiana, in his individual and official capacity.  At all times described herein, DR. THOMA was the Coroner of Caddo Parish and was responsible for the hiring of trained medical personnel to conduct autopsies.  He was responsible for the supervision, administration, policies, practices, customs, and operations of the CORONER'S OFFICE.  DR. THOMA was and is a final policy maker.  At all pertinent times, DR. THOMA was acting under color of law.  He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.

6.

**JAMES TRAYLOR, M.D.** (hereinafter, "DR. TRAYLOR") is a person of the full age of majority and a resident of Louisiana, in his individual capacity.  At all times described herein, DR. TRAYLOR contracted with CORONER'S OFFICE to perform autopsies and provide testimony in criminal trials.  At all pertinent times, DR. TRAYLOR was acting under color of law.  He is liable directly for the unconstitutional actions and state law actions complained of herein.

3

7.

**CADDO PARISH DISTRICT ATTORNEY'S OFFICE** (hereinafter, "DISTRICT ATTORNEY'S OFFICE") is a political entity capable of suing and being sued.  The DISTRICT ATTORNEY'S OFFICE is responsible for screening, charging, and prosecuting cases for crimes that occur in Caddo Parish, Louisiana.

8.

**JAMES STEWART** (hereinafter "STEWART") is a person of full age of majority and a resident of Louisiana, in his individual and official capacity.  Since December 1, 2015, STEWART was the elected District Attorney of Caddo Parish and responsible for the administration, policies, practices, customs, and operations of Defendant DISTRICT ATTORNEY'S OFFICE.  In addition, STEWART was responsible for all training and supervision of his employees.  He adopted and implemented policies that led to unconstitutional actions and the state law actions complained of herein, including the failure to supervise and train prosecutors to determine whether a conviction is wrongful and exoneration appropriate.  STEWART was and is a final policy maker.  At all pertinent times, STEWART was acting under color of law.  He is liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.

9.

**SHREVEPORT FIRE DEPARTMENT** (hereinafter, "FIRE DEPARTMENT") is a political entity capable of suing and being sued.  The FIRE DEPARTMENT is responsible for providing emergency and non-emergency services to all of Shreveport's citizens, including the provision of emergency medical services through paramedics.

4

10.

**SHARON SULLIVAN** (hereinafter, "SULLIVAN"), a person of the full age of majority and a resident of Louisiana, in her individual capacity as paramedic for Defendant FIRE DEPARTMENT.  At all times described herein, SULLIVAN was a paramedic responsible for responding to 911 calls and providing emergency medical care to the public.  At all pertinent times, SULLIVAN was acting under color of law.  She is liable directly for the unconstitutional actions and state law actions complained of herein.

11.

**DANIEL MARS** (hereinafter, "MARS"), a person of the full age of majority and a resident of Louisiana, in his individual capacity as paramedic for Defendant FIRE DEPARTMENT.  At all times described herein, MARS was a paramedic responsible for responding to 911 calls and providing emergency medical care to the public.  At all pertinent times, MARS was acting under color of law.  He is liable directly for the unconstitutional actions and state law actions complained of herein.

12.

**DALE COX** (hereinafter, "COX"), a person of the full age of majority and a resident of Louisiana, in his official and individual capacity, as former First Assistant in Defendant DISTRICT ATTORNEY'S OFFICE, responsible for exercising charging authority and prosecuting criminal cases.  At times described herein, COX was also the acting District Attorney and responsible as a final policy maker for his own actions and the actions of his subordinate employees of Defendant DISTRICT ATTORNEY'S OFFICE.  In addition, while acting District Attorney, COX was responsible for all training and supervision of his employees.  He adopted and implemented policies that led to unconstitutional actions and the state law actions complained of

herein, including the failure to supervise and train prosecutors to avoid wrongful convictions of African-American men.  At all times COX was acting under color of law.  He is liable directly for unconstitutional actions and state law actions complained of herein.

13.

**J. DOES #1-99** were at all relevant times adult residents of Louisiana who were acting under color of state law and were employees or agents of Caddo Parish 911 and Shreveport Police Department.   J. DOES #1-99 are liable both directly for the unconstitutional actions and vicariously for the state law actions complained of herein.  Plaintiffs are unaware of the true names and capacities of these Defendants and therefore sues those persons by fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained and intends to seek immediate discovery from Defendants to determine the identity of J. DOES #1-99.

14.

**ABC INSURANCE COMPANIES #1-10** are yet unknown insurance companies who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of Defendants named herein.  Plaintiffs are unaware of the true names and capacities of these Defendants and therefore sues those entities by fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained and intends to seek immediate discovery from Defendants to determine the identity of ABC INSURANCE COMPANIES.

### III.    VENUE

15.

Venue is in the Western District of Louisiana under § 28 U.S.C. Section 1391 (b) because many of the parties reside or resided in the district, the events took place in the district, and a

substantial part of the events giving rise to the claims asserted herein occurred in Caddo Parish, Louisiana, within the Western District.

## IV.   FACTUAL ALLEGATIONS

### 16.

On February 16, 2012, one-year-old Roderius Lott died in his sleep at 6809 Broadway Street in Shreveport, Louisiana, the family home of his father, Mr. Crawford.  Roderius had been suffering from pneumonia in all five lobes of his lungs, and the bacteria had entered his blood stream, causing septic shock and death.

### 17.

On information and belief, it is known by Defendants that 6809 Broadway Street is in an area of Shreveport, Louisiana that is almost exclusively occupied by African-Americans.

### 18.

The cause of Roderius' death was sepsis due to bacterial purulent pneumonia with abscess formation.

### 19.

The night before Roderius died, he and Mr. Crawford slept on a fold-out couch with several blankets and pillows in one bedroom.

### 20.

Mr. Crawford's uncle Larry Crawford, his mother Abbie Crawford, his sister Shamichael Mitchell, and his brother Fostravz Thomas were all home with Mr. Crawford and Roderius, and were sleeping at 6809 Broadway Street the night before Roderius died.  The door to the room in which Mr. Crawford and his son slept was broken and did not close all the way.  None of the individuals present that evening reported hearing any crying or noises coming from that room.

21.

On the morning of February 16, 2012, Mr. Crawford woke to find Roderius unresponsive. Mr. Crawford woke the house with his hollering and screaming.  He had his son in his arms and was yelling that there was something wrong with the baby.  Roderius was not moving or breathing.

22.

Fostravz Thomas and Larry Crawford called 911, and the operator instructed them to give the baby CPR.  Abbie Crawford and Shamichael Mitchell both attempted to give the baby mouth-to-mouth resuscitation.  Abbie gave the baby chest compressions but was too upset to do any more. At some point, she fainted with the baby in her arms.

23.

Rather than quickly sending paramedics to provide emergency medical care to the unresponsive child, the 911 dispatchers sent out police along with Defendant FIRE DEPARTMENT's ambulance, suspecting foul play based not on any rational basis, but on the African-American neighborhood and number of people in the house.

24.

The ambulance took ten to fifteen minutes to arrive.  Several frantic 911 calls were made by the Crawfords, complaining that the ambulance was taking too long.

25.

During the process of securing an ambulance to the house, the 911 dispatcher made a call to an unknown male, likely law enforcement, and asked who lived at 6809 Broadway.  She stated: "They're acting a fool over there. . . . They ask for everything, but [the] baby's dead." The unknown male responded: "Probably slept on [the] damn baby. There'll be 100 folks in the house."

26.

When the ambulance finally arrived, it passed by the house at 6809 Broadway.  Mr. Crawford, who had been waiting outside, ran after the ambulance with his son in his arms.  When they stopped, he handed his son to Defendant SULLIVAN, who took him to the back of the ambulance.

27.

Defendant SULLIVAN examined the body.  She negligently mistook a normal fluid draining from Roderius' nose to be indicative of foul play.  In addition, she falsely claimed to see bruising on the child's buttocks, which was not visible to the naked eye.  Finally, she falsely claimed to observe petechiae in the eyes, which was not found at the autopsy.

28.

Defendant MARS was another paramedic on the scene. While Defendant SULLIVAN examined the baby in the ambulance, Defendant MARS spoke to Mr. Crawford.  Defendant MARS falsely claimed that Mr. Crawford told Defendant MARS that Roderius fell off the bed.

29.

Defendant MARS immediately considered the home a "crime scene" and claimed that the "situation was getting kind of violent," so he asked the ambulance driver to take them to the hospital.  They ran the lights and siren just until they got around the corner, and then turned them off.

30.

Defendant MARS watched the examination of Roderius in the emergency room.  Although the bruising on the baby's buttocks was not visible to the naked eye, Defendant MARS falsely claimed that he observed "sickening" bruising and that it was "very upsetting."

31.

The Shreveport Police Department was dispatched at the same time as the ambulance, and arrived soon after.

32.

The officers placed Mr. Crawford in the backseat of a police cruiser and detained him for over an hour before taking him to the police station for interrogation.  During the time he was detained, Roderius' mother Lakendra Lott was permitted to get into the vehicle and explain to Mr. Crawford that their son had died.  Upon hearing the news, Mr. Crawford cried and banged his fists against the seat of the police cruiser.  He continued to cry and hold his head after Ms. Lott left the vehicle.

33.

Defendant THOMA was called to the emergency room to examine Roderius' body upon his arrival.  Before even starting his exam, he had a preconceived suspicion based on the race of the parties and neighborhood in which they lived that the baby had been smothered.  Upon examination, he simply confirmed his preconceived suspicion and ascribed the cause of death to suffocation from smothering, and manner of death as homicide.  He issued the death certificate at 7:34 a.m. on February 16, 2012.

34.

Defendant CORONER's OFFICE contracted with Defendant TRAYLOR, a forensic pathologist, to conduct an autopsy on Roderius.  Defendant TRAYLOR incised the skin on the buttocks and scalp, and found hemorrhages that were not visible to the naked eye.  He determined that the injuries to the child were the result of child abuse, and, combined with the contusions to the lips, Roderius' death was "more likely than not" a smothering.

35.

Defendant TRAYLOR did not take tissue samples from the buttocks, scalp, or lips, although doing so is routine practice in autopsies and would have revealed the timing of the injuries.

36.

Defendant TRAYLOR did take a blood culture and tissue samples from the lungs.  He did not wait for the results of the tissue samples before announcing that Roderius' death was a homicide.  He did not change his determination when he discovered that there was pneumonia in all five lobes of the lungs, with edema, necrosis of the lung tissue, and hemorrhaging.  The blood culture tested positive for alpha hemolytic streptococcus bacteria.  He did not order any further testing to determine whether the positive blood culture was the result of sepsis, or, as he would later claim, a contaminated needle.

37.

Defendant TRAYLOR's autopsy report claimed that the cause of death was a homicide based upon a finding of cerebral edema without herniation – meaning swelling of the brain, and he ultimately claimed that cerebral edema is a side effect of suffocation.  This is wildly inconsistent with medical literature, which is clear that cerebral edema is not a side effect of suffocation.

38.

Authorities interrogated Mr. Crawford about the death of his son and days later, on February 24, 2012, arrested Mr. Crawford for second degree murder.

39.

Law enforcement relied almost exclusively on the opinions of Defendants THOMA and TRAYLOR.  For example, Mr. Crawford consistently denied abusing, hitting, and killing his son.

When Mr. Crawford was arrested, the arresting officer told Mr. Crawford that "Your statement of how it happened doesn't jive with what the coroner is saying when we met with the coroner, and he says, without a doubt, the baby was suffocated."  Mr. Crawford responded by repeatedly stating "I did not suffocate him. I'm telling you the God honest truth [sic] of what I know, sir."

40.

Defendants TRAYLOR and THOMA were operating under what is commonly known as "confirmation bias," which occurs when an expert begins an investigation with preconceived expectations and theories, and, as a result, fails to follow professional standards of practice and instead focuses only on evidence that supports those theories, ignoring or explaining away evidence to the contrary.  In order to avoid this bias, accepted standards in the field of forensic medicine demand that a forensic scientist approach his or her task with no preconceived ideas, reserving judgment until all of the evidence has been gathered. TRAYLOR and THOMA's preconceived expectations and theories were based on race and racism, and they operated with deliberate indifference to these accepted professional standards of practice.

41.

Defendant TRAYLOR not only succumbed to confirmation bias, he admitted to actual bias, conducting the autopsy not with an open mind, but with the idea that he needed to exclude homicide as the cause of death.

42.

Forensic investigation of a childhood fatality typically has three steps: 1) collection and preservation of evidence; followed by, 2) identification and analysis of the key findings, including the investigation, case documents and post mortem followed by the development of a differential diagnosis; and finally, 3) diagnosis, final opinions, and interpretation.  These stages ensure that

both evidence and analysis are as reliable as possible.  Particularly in cases of sudden infant death, standards of the profession strongly advise medical examiners to diagnose the cause and circumstance (or manner of death) through the use of scientific methods, principles, and procedures following a complete and thorough investigation.

43.

Defendants THOMA and TRAYLOR's investigation of the cause and manner of death fell far short of professional standards of practice.

44.

The laboratory report on the culture of Roderius' lung states that Roderius' blood was infected with "alpha hemolytic streptococcus" and goes on to state that specific type could not be identified.  There are two types of alpha hemolytic streptococci: streptococcus pneumoniae ("S. pneumoniae" or "strep pneumoniae") and viridans group streptococci ("viridans group streptococci" or "VSG").  Defendant TRAYLOR falsely claimed that the lab technician told him that he could not identify the strain of bacteria found in Roderius' blood as streptococcus pneumonia.  But the lab report itself establishes that the lab did not run the tests necessary to reach this conclusion.  It states that only one test was run, a "gram stain."

45.

The Centers for Disease Control Lab Manual establishes that three tests must be run simultaneously to identify strep pneumonia: a gram stain, a catalase test and an optochin test, with a fourth test, bile solubility, run as a fourth, confirmatory test.

46.

In the absence of these three tests, there was absolutely no basis for concluding that Roderius was not infected with streptococcus pneumonia and that his death was a homicide.

47.

In an attempt to explain away the significance of bacteria in Roderius' blood sample, Defendant TRAYLOR falsely claimed that the bacteria may have come from contamination—either from the surface of Roderius' skin or the needle itself.  The medical literature establishes, however, that the odds of the blood testing positive for alpha hemolytic streptococci as a result of contamination are almost nonexistent.

48.

Defendant TRAYLOR failed to order a lab culture of the infected tissue in Roderius' lungs, contrary to the protocol of the National Association of Medical Examiners.

49.

Defendant TRAYLOR falsely claimed at trial that Roderius was immunized against pneumonia and that the "vaccine would have had to have been bad" in order for him to succumb to complications of pneumonia.  In fact, Roderius' medical records show that he received only one dose of a three-dose Prevnar-13 vaccine schedule, at age seven months.

50.

The Centers for Disease Control guidelines provide that children who are first vaccinated with Prevnar at seven months of age should receive a total of three doses, two doses of the vaccine at least four weeks apart and a booster dose at age 12 through 15 months. Nothing in the medical literature establishes that an infant who receives only a single dose of the vaccine at age seven months will be immunized against pneumonia.

51.

Defendant TRAYLOR falsely testified at trial that the pneumonia found in Roderius' lung tissue was "early" because the pneumonia was in Roderius' bronchial tubes, and had not

"consolidated" in the lobes of the lungs, i.e., the alveoli of the lungs had not filled up with pus. But bronchial pneumonia, by definition, does not involve the entire lobe of the lung, and the lack of consolidation in the lobes of Roderius' lungs does not mean that the bronchial pneumonia was not severe.  Bronchial pneumonia is more common in the very young than lobar pneumonia and it can cause sepsis in infants.  There is no medical basis for TRAYLOR's claim that if Roderius had died of sepsis, "[y]ou'd have a lobar-type pneumonia involving the entire lobe of lung."

52.

Defendants TRAYLOR and THOMA both falsely claimed that the death was due to smothering because of the presence and pattern of injury on Roderius' lips.  Defendant TRAYLOR claimed that "[t]here's really no accurate way to date a bruise" by microscopic examination.  This testimony is flatly contradicted by medical science.

53.

Basic forensic treatises and a variety of scientific studies establish that microscopic examination of damaged skin samples can be used to establish the time a skin injury was sustained. The underlying science is basic, well-understood and well-documented in the literature.  Damaged skin responds to injury in a standard pattern as the skin undertakes the healing process.  By taking tissue samples of sections of Roderius' inner lips and staining them to fix the samples, a forensic pathologist could have established when the injuries were sustained based on whether white blood cells (and which types of them) were present.  Defendant TRAYLOR did not perform this most basic test.

54.

Defendant TRAYLOR failed to preserve tissue samples.  This was a fundamental violation of the standard protocol in post-mortem examinations generally, and in pediatric post-mortems in

particular.  The guidelines, textbooks, and articles all stress the importance of preserving tissue so that this critical evidence can be examined. Defendant TRAYLOR's failure to preserve tissue samples deprived Mr. Crawford of his right to due process, in that he was unable to conduct independent testing and prove that the injury occurred hours or days before his death, and not at the time of death.

55.

At trial, the only evidence presented by the state that Mr. Crawford had an intent to kill Roderius was provided by Defendant TRAYLOR.

56.

Defendant TRAYLOR testified at trial that he was confident that someone smothered the baby, and further, that "This is a victim. There's only one voice for the victim. I'm the guy that did the autopsy. I'm the voice for the victim, which in this case is a one-year-old child. There is no one else that can speak for the victim other than myself."

57.

Mr. Crawford was a proud and loving father of both his son and Khasiah Crawford, whom he had with a former girlfriend.

58.

At Mr. Crawford's first-degree murder trial, the prosecution illegally excluded African-American jurors from the jury.

59.

Defendant DISTRICT ATTORNEY'S OFFICE failed to train prosecutors to refrain from illegally excluding African-American jurors.

60.

Defendant DISTRICT ATTORNEY'S OFFICE failed to train and supervise prosecutors to avoid racism in evaluating, charging, and prosecuting cases.  Policy and custom within the office permitted prosecutors to place racist memorabilia in their offices and defend the Confederate Flag outside the courthouse.

61.

Defendant DISTRICT ATTORNEY'S OFFICE failed to train and supervise prosecutors to avoid wrongful convictions and death sentences.  Prosecutors were trained to secure convictions rather than secure justice.

62.

Defendant COX publicly stated that certain parts of the Caddo Parish community constituted a "jungle" and that securing the death penalty against African-American defendants was both a biblical command and part of his racist world view.

63.

Defendant COX pursued a conviction and death sentence against Mr. Crawford even though there was insufficient evidence to even support a prosecution.

64.

Defendant COX pursued a conviction and death sentence against Mr. Crawford based upon his personal religious beliefs in violation of the state and federal constitution.

65.

Defendant COX pursued a conviction and death sentence against Mr. Crawford based upon his own mental instability that occurred as a result of his failure to secure a death sentence against a different African-American defendant, in a different case.

66.

The trial of Mr. Crawford was infected by racial bias.  For example, even though evidence was presented that Mr. Crawford was present at Roderious' birth, readily acknowledged that the boy was his, and was a constant presence in his son's life, Defendant COX argued Roderious "was born and [Mr. Crawford] didn't acknowledge it, it wasn't his baby. And so the baby didn't take his name, took his mother's name Rod[e]rious Lott. He didn't raise the baby. He really didn't even see the baby except on rare occasions."  This argument was based on racial stereotypes and animus, and not upon the facts of this case.

67.

Defendant COX could freely use racial stereotypes to prosecute Mr. Crawford because he had used five of his seven peremptory strikes to remove African-Americans from the jury.

68.

Defendant COX's conduct was not only filled with racial animus, it included activities that had nothing to do with his preparation for the initiation of Mr. Crawford's prosecution and judicial proceedings.  Instead, Defendant COX participated in the investigation of the case including searching for the clues and corroboration that gave Defendant COX putative probable cause to have Mr. Crawford arrested and then charged with capital murder.

69.

Numerous experts from across the country detailed how Defendant TRAYLOR's findings were unscientific, and entirely made-up to secure a conviction.  For example, Defendant TRAYLOR's claim that Roderius' death was a homicide based upon the cerebral edema was intentionally false in order to secure Mr. Crawford's conviction.

70.

In the alternative, Defendant TRAYLOR's claim that Roderius' death was a homicide based upon the cerebral edema was so recklessly ill-informed that it cannot have been made in good faith.

71.

Mr. Crawford's conviction and sentence have already been invalidated.

72.

Beginning in November of 2014, attorneys for Mr. Crawford made regular and repeated attempts to address Mr. Crawford's innocence with Defendant DISTRICT ATTORNEY'S OFFICE, to agree upon release without going through the lengthy appeals process.  Attorneys provided evidence of Mr. Crawford's innocence to Defendant DISTRICT ATTORNEY'S OFFICE, both in court pleadings and outside of the court process.

73.

Attempts to settle the matter were ignored or rebuffed.  During oral arguments before the Supreme Court of Louisiana, Defendant DISTRICT ATTORNEY'S OFFICE strongly defended Mr. Crawford's wrongful conviction.   Soon afterwards, however, Defendant DISTRICT ATTORNEY'S OFFICE claimed to place the case in its "Conviction Integrity Unit" and claimed to be in agreement regarding Mr. Crawford's actual innocence.  However, months passed with no action.

74.

It was not until the Supreme Court of Louisiana issued an opinion reversing Mr. Crawford's conviction that Mr. Crawford was released, and even then Defendant STEWART required Mr. Crawford's family to shoulder payment of a $50,000 bond to secure his release. Defendants

STEWART and the DISTRICT ATTORNEY'S OFFICE acted with deliberate indifference to Mr. Crawford's civil rights and pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates in its jurisdiction.

75.

Mr. Crawford was detained in custody on February 16, 2012.  He was convicted of first degree murder on November 12, 2013 and sentenced to death on November 13, 2013.  He remained on death row under a death sentence in Louisiana under unconstitutional conditions of confinement from 2013 until November 6, 2016 when the Supreme Court of Louisiana reversed his conviction. Mr. Crawford was released on a $50,000 bond—that he had to post—on November 22, 2016.  He remained on bond until April 17, 2017, when Defendant STEWART dismissed the charges against him.

76.

Defendants had a duty to Mr. Crawford and all members of the public to conduct criminal investigations in a fair, unbiased manner, and breached their duty to Mr. Crawford.  As a result, Plaintiffs suffered the loss of the ability to function in a normal, mutually supportive parent-child relationship with each other.

77.

At all times relevant to this complaint, Defendants acted under color of state law.

78.

All Defendants are liable to Plaintiffs for compensatory damages, and Defendants THOMA, TRAYLOR, STEWART, SULLIVAN, MARS, and COX are liable to Plaintiffs for punitive damages for the claims brought against them in their individual capacity.

79.

All Defendants are liable jointly, severally, and in solido for Plaintiffs' injuries.

80.

Defendants' actions were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of Mr. Crawford.  Defendants' actions were the proximate cause of the deprivation of Mr. Crawford's constitutional rights and Plaintiffs' damages.

## V.    CAUSES OF ACTION

**COUNT 1 – § 1983 Violation Based on Denial of Right to Fair Trial—Defendants CORONER'S OFFICE, DISTRICT ATTORNEY'S OFFICE, FIRE DEPARTMENT, DR. THOMA, DR. TRAYLOR, COX, SULLIVAN, MARS and J. DOES #1-99**

81.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

82.

Defendants named in this Count, acting individually and together, under color of law, acted to violate Mr. Crawford's right to a fair trial.  Due to Mr. Crawford's race and the neighborhood in which he lived, Defendants responded to the 911 call with an immediate suspicion that a crime had been committed, rather than a tragic death of an infant child by sepsis due to bacterial purulent pneumonia with abscess formation.  From the initial response by Defendants J. Does #1-99 to the conclusion of trial, the investigation into the death of Roderius Lott and subsequent prosecution of Mr. Crawford was infected with racism.

83.

Even though Mr. Crawford repeatedly informed police that he had not hit his child, Defendants THOMA and TRAYLOR recklessly and falsely, and without any support, claimed not only that Roderius' death was a homicide but that Mr. Crawford had committed the homicide.

84.

Based upon the failure of Defendant DISTRICT ATTORNEY'S OFFICE to train and supervise Defendant COX, Mr. Crawford's prosecution was based upon religious and racial antipathy rather than factual evidence.

85.

Based upon the failure of Defendant DISTRICT ATTORNEY'S OFFICE to train and supervise Defendant COX, Defendant COX distorted evidence against Mr. Crawford and exhorted Defendants THOMA and TRAYLOR to testify falsely with reckless disregard for the truth.

86.

Defendant COX illegally struck African-Americans from Mr. Crawford's jury, and then compounded the violation of Mr. Crawford's constitutional rights by making constitutionally improper arguments at trial.

87.

The result of all Defendants' actions was the denial of due process by failing to observe that fundamental fairness essential to the very concept of justice.  The absence of that fairness fatally infected the investigation and prosecution of Mr. Crawford.

**COUNT 2 – § 1983 Violation Based on Denial of Liberty Without Due Process of Law—Defendants CORONER'S OFFICE, DISTRICT ATTORNEY'S OFFICE, FIRE DEPARTMENT, DR. THOMA, DR. TRAYLOR, COX, SULLIVAN, MARS, STEWART, and J. DOES #1-99**

88.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

89.

Defendants named in this Count, acting individually and together, under color of law, acted to violate Mr. Crawford' right to liberty and to be free from punishment without due process of

law.   Mr. Crawford's most fundamental liberty interest—to be free from arrest, detention, prosecution and incarceration in unconstitutionally brutal conditions of confinement on Louisiana's Death Row—was interfered with by Defendants state actors.

90.

The actions of Defendants combined to deny him due process.   Defendants FIRE DEPARTMENT, SULLIVAN, MARS, and J. DOES #1-99 responded to a 911 call with an immediate suspicion that a crime had been committed, rather than a tragic death of an infant child by sepsis due to bacterial purulent pneumonia with abscess formation.   Defendants CORONER's OFFICE and THOMA followed a policy, practice, or custom of inadequately investigating the death of Roderius, permitting Defendants THOMA and TRAYLOR to rule the death a homicide and caused the charging of Mr. Crawford with homicide.   Defendants DISTRICT ATTORNEY'S OFFICE and COX prosecuted Mr. Crawford based upon religious and racial antipathy rather than factual evidence, distorted evidence against Mr. Crawford, exhorted Defendants THOMA and TRAYLOR to testify falsely with reckless disregard for the truth, illegally struck African-Americans from Mr. Crawford's jury, and compounded the violation of Mr. Crawford's constitutional rights by making constitutionally improper arguments at trial.   Finally, Defendants STEWART and the DISTRICT ATTORNEY'S OFFICE acted with deliberate indifference to Mr. Crawford's civil rights and pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates in its jurisdiction.

91.

The result of all Defendants' actions was the interference of Mr. Crawford's liberty interest and punishment without due process of law.

23

**COUNT 4 — § 1983 Violation Based on the Denial of Equal Protection Under the Law--Defendants CORONER'S OFFICE, DISTRICT ATTORNEY'S OFFICE, FIRE DEPARTMENT, DR. THOMA, DR. TRAYLOR, COX, SULLIVAN, MARS, STEWART, and J. DOES #1-99**

92.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

93.

Defendants named in this Count, acting individually and together, under color of law, acted to violate Mr. Crawford' right to equal protection under the law.  The investigation, detention, arrest, prosecution, and subsequent incarceration of Mr. Crawford was based on intentionally unequal treatment by Defendants state actors.  Mr. Crawford is a member of a suspect class and therefore, the unequal treatment by Defendants of Mr. Crawford is subject to strict scrutiny.

94.

Were it not for the racial discrimination which permeated all stages of the prosecution against him, Mr. Crawford would not have been sentenced to death and held for 4 years, 9 months, and 6 days illegally in custody.

**COUNT 5 — § 1983 Racially Discriminatory Use of Peremptory Challenges—Defendants DISTRICT ATTORNEY'S OFFICE and COX**

95.

Plaintiff repeats and re-alleges each and every allegation of the Complaint.

96.

Mr. Crawford's conviction was reversed after the Supreme Court of Louisiana determined that Defendants DISTRICT ATTORNEY'S OFFICE and COX's use of 5 of 7 peremptory challenges to exclude African-Americans from Mr. Crawford's jury established a *prima facie* case for a *Batson v. Kentucky*, 476 U.S. 79 (1986) violation.  The improper use of these Defendants'

peremptory strikes allowed Defendant COX to freely use racial stereotypes and violated Mr. Crawford's constitutional rights.

97.

As a direct and proximate result of Defendants DISTRICT ATTORNEY'S OFFICE and COX's actions, Mr. Crawford was wrongly prosecuted, detained, and incarcerated for 2 years on Louisiana's Death Row and suffered the other grievous injuries and damages set forth above and below.

**COUNT 6 –** *Monell* **Violation of § 1983 Based on Establishment of Policies, Patterns or Practices pursuant to which Mr. Crawford was Investigated, Charged, Detained, and Prosecuted Based on his Race—Defendants CORONER'S OFFICE, DISTRICT ATTORNEY'S OFFICE, FIRE DEPARTMENT, DR. THOMA, and COX**

98.

Plaintiff repeats and re-alleges each and every allegation of the Complaint.

99.

Defendants named in this Count, acting individually and together, under color of law, violated Mr. Crawford's right to liberty and be free from punishment without due process as protected by the Fourteenth Amendment to the United States Constitution and 42 USC § 1983. They did so by establishing and maintaining policies, patterns or practices that they knew would deprive African-Americans such as Mr. Crawford of unbiased and fair criminal investigations, arrests, and prosecutions.

100.

Plaintiffs were individually harmed by these policies, patterns, or practices because they resulted in the wrongful conviction of Mr. Crawford, who was deprived of a fair trial.

101.

At all pertinent times, Defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional and civil rights of Mr. Crawford by establishing the above-described policies, patterns, or practices.

102.

The above-named Defendants are therefore liable to Plaintiffs for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**COUNT 7 – State Claim of Intentional Infliction of Emotional Distress**

103.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

104.

Defendants, by their extreme and outrageous conduct, intentionally or recklessly caused emotional distress to Plaintiffs.  Defendants are therefore subject to liability for such emotional distress.

**COUNT 8 – State Claim of Tortious Interference with the Parent-Child Relationship**

105.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

106.

Defendants illegal actions violated Mr. Crawford's constitutional rights to a fair trial, resulting in his detention and incarceration for 4 years, 9 months, and 6 days.   Defendants had a duty to Mr. Crawford and all members of the public to conduct criminal investigations in a fair,

unbiased manner and breached their duty to Mr. Crawford.  As a result, Plaintiffs suffered the loss

of the ability to function in a normal, mutually supportive parent-child relationship with each other.

**COUNT 9- State Claim of Direct Action Against an Insurer, Pursuant to LA R.S. § 22:1269**

107.

Plaintiffs repeat and re-allege each and every allegation of the Complaint.

108.

At all applicable times, defendant, ABC INSURANCE COMPANIES, afforded liability

insurance coverage to one or more of Defendants.  Accordingly, ABC INSURANCE COMPANY

is liable to Plaintiffs for the intentional and/or negligent acts of said Defendants.

## VI.   INJURIES

As a result of the actions of Defendants as described above, damages have been incurred

as follows:

a.   Rodricus Crawford was incarcerated, prosecuted, convicted, sentenced to death and held on death row;

b.   Rodricus Crawford experienced unconstitutional and inhumane conditions while on death row, including psychological terror at the prospect of execution;

c.   Rodricus Crawford was unable to attend the burial of his son, and was taken away from his daughter;

d.   Rodricus Crawford's family paid $20,000 for a lawyer, and was never able to secure repayment;

e.  Rodricus Crawford had to make a $50,000 bond to secure his own release on November 22, 2016;

f.  Loss of the friendship and companionship of others, including his family;

g.  Loss of the opportunity to raise his daughter;

h.  Medical and mental health expenses;

i.  Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

j.  Severe psychological damage, mental anguish and emotional distress;

k.  Loss of job opportunities;

l.  Loss of family relationships; and

m.  Humiliation, indignities and embarrassment.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that after due proceedings there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1.    Compensatory and punitive damages as prayed for herein;

2.    Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794(b) and all costs of these proceedings and legal interest;

3.    Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable statute;

4.    Relief under La. C.C. arts. 2315 and 2321 from the intentional and/or negligent acts and/or omissions of Defendants herein; and

5.    All other relief as appears just and proper to this Honorable Court.

RESPECTFULLY SUBMITTED, this 16th day of November, 2017.

THE CLAIBORNE FIRM, P.C.

/s/ David J. Utter
DAVID J. UTTER
Louisiana Bar Number: 23236
*Lead Attorney for Plaintiff*
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com

THE CLAIBORNE FIRM, P.C.

/s/ William R. Claiborne
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
*Appearing Pro Hac Vice\**
*Attorney for Plaintiff*
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
will@claibornefirm.com

/s/ Cecelia T. Kappel
Cecelia Trenticosta Kappel
Louisiana Bar Number 32736
*Attorney for Plaintiff*
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955 Telephone
ctkappel@thejusticecenter.org

*PHV application pending