# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

RODRICUS CRAWFORD

CIVIL ACTION NO. 17-01509

VERSUS

JUDGE ELIZABETH E. FOOTE

CADDO PARISH CORONER'S
OFFICE, ET AL.

MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Now before the Court are two Motions to Dismiss for Failure to State a Claim Upon Which Relief can be Granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). The first motion was filed by Defendants James Stewart, Dale Cox, and the Caddo Parish District Attorney's Office. [Record Document 16]. This motion is opposed. [Record Document 29]. For the reasons discussed below, the motion to dismiss [Record Document 16] is **GRANTED**.

The second motion to dismiss was filed by Defendant Todd G. Thoma and the Caddo Parish Coroner's Office. [Record Document 18]. Alternatively, Thoma and the Caddo Parish Coroner's Office move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). This motion is opposed. [Record Document 28]. For the reasons discussed below, the motion to dismiss [Record Document 18] is **GRANTED.**

Also before the Court is a Motion to Dismiss Penalty, Punitive, or Exemplary Damages filed by the Caddo Parish Coroner's Office, the Caddo Parish District Attorney's Office, Cox, Stewart, and Thoma. [Record Document 15]. This motion is opposed. [Record Document 30]. For the reasons discussed below, the motion to dismiss penalty, punitive, or exemplary damages [Record Document 15] is **GRANTED**.

## FACTUAL BACKGROUND

This case arises out of the arrest, prosecution, and conviction of Rodricus Crawford ("Plaintiff") for the murder of his son, Roderius Lott. Roderius died on February 16, 2012. Record Document 1, ¶ 16. Authorities interrogated Plaintiff about Roderius's death and on February 24, 2012, he was arrested and subsequently charged with first degree murder. *Id.* at ¶ 38. Plaintiff was convicted of first degree murder on November 12, 2013, in the First Judicial District Court, Caddo Parish, and was sentenced to death on November 13, 2013. *Id.* at ¶ 75; *State v. Crawford*, 218 So. 2d 13 (La. 11/16/16).[1] Defendant Dale Cox ("Cox") prosecuted Plaintiff and was the acting District Attorney of Caddo Parish at the time. *Id.* at ¶s 12 & 63. On November 6, 2016, the Louisiana Supreme Court reversed Plaintiff's conviction and remanded his case for a new trial. *Id.* at ¶ 75. He was released on November 22, 2016, after posting a $50,000 bond. *Id.* Defendant James Stewart ("Stewart"), the current District Attorney of Caddo Parish, dismissed the charges against Plaintiff on April 17, 2017. *Id.*

Plaintiff filed the instant lawsuit under Title 42 U.S.C. § 1983 on behalf of himself and his minor child Khasiah Crawford,[2] against the Caddo Parish Coroner's Office; Coroner Todd G. Thoma; James Traylor, M.D.; the Caddo Parish District Attorney's Office; James Stewart, Caddo Parish District Attorney; the Shreveport Fire Department; Sharon Sullivan; Daniel Mars; Dale Cox; ninety-nine "J. Does" that Plaintiff alleges work for Caddo Parish 911 or the Shreveport Police Department; and ten unnamed insurance companies. Record Document 1, p. 1. Plaintiff

---

[1] Defendants have attached the Louisiana Supreme Court's opinion overturning Plaintiff's conviction as an exhibit to both motions to dismiss for failure to state a claim. *See* Record Documents 16 & 18. The Court will refer to this case by its official citation and reporter number rather than as an exhibit.

[2] As is discussed more fully below, Khasiah Crawford's claims are **DISMISSED WITH PREJUDICE**. *Infra,* Part IV.

claims that his prosecution was illegally based on race and religion, and a complete indifference to the evidence. *Id.* According to Plaintiff, his prosecution and conviction were driven by Caddo Parish's well-known history of racism and the arbitrary application of the death penalty. *Id.* at 2. Plaintiff asserts that Defendants are liable to him under § 1983 for violations of his Sixth and Fourteenth Amendment rights, as well as the state law torts of intentional infliction of emotional distress and tortious interference in a parent-child relationship. *Id.* at ¶s 81–106. Finally, Plaintiff brings a direct action under state law against the insurance companies of Defendants. *Id.* at ¶ 108.

The Court now turns to the facts giving rise to Plaintiff's alleged causes of action. On the morning of February 16, 2012, an ambulance was summoned to a house in Shreveport, Louisiana where Plaintiff and his infant son Roderius, along with several other family members, were staying. *Id.* at ¶s 16 & 20. According to the complaint, Roderius had been suffering from pneumonia in all five lobes of his lungs and the bacteria had entered his blood stream, causing septic shock and death. *Id.* at ¶ 16. The family called an ambulance because Plaintiff, who was sharing a fold-out couch with Roderius, had awakened to find that Roderius was not breathing. *Id.* at ¶s 19 & 21. Plaintiff alleges that the 911 dispatchers sent out police along with a fire department ambulance because they suspected foul play based on the primarily African-American neighborhood in which the house was located and the number of people in the house.[3] *Id.* at ¶ 23.

---

[3] The complaint states that the 911 dispatcher made a call to someone, likely law enforcement, to inquire who lived at 6809 Broadway and made the following statement: "They're acting a fool over there. . . . They ask for everything, but [the] baby's dead." The unknown male responded: "Probably slept on [the] damn baby. There'll be 100 folks in the house." Record Document 1, ¶ 25. The complaint does not identify these individuals.

One of the paramedics who arrived on the scene, Defendant Sharon Sullivan[4] ("Sullivan"), examined Roderius's body and suspected foul play based on fluid[5] draining from the child's nose. *Id.* at ¶ 27. Sullivan also claimed to observe bruises on the child's buttocks and petechiae in his eyes. *Id.* Another paramedic, Defendant Daniel Mars ("Mars"), spoke to Plaintiff and claimed that Plaintiff told him that Roderius had fallen off a bed. *Id.* at ¶ 28. Mars asked the ambulance driver to take them to the hospital because he claimed "the situation was getting kind of violent." *Id.* at ¶ 29. The Shreveport Police Department arrived shortly thereafter. *Id.* at ¶ 31. Upon arrival, officers placed Plaintiff in the back of a police cruiser, detained him for over an hour, and then took him to the police station for interrogation. *Id.* at ¶ 32.

Defendant Todd G. Thoma ("Thoma"), the elected Coroner of Caddo Parish, was summoned to the emergency room to examine the body. *Id.* at ¶ 33. Thoma determined that the cause of death was suffocation from smothering and that the death was a homicide. *Id.* Defendant James Traylor, MD ("Traylor"),[6] a forensic pathologist, contracted with Defendant Caddo Parish Coroner's Office to perform an autopsy on Roderius. *Id.* at ¶ 34. Traylor incised the skin on Roderius's buttocks and scalp and found hemorrhages that were not visible to the naked eye. *Id.* He determined that the injuries were a result of child abuse and decided that, combined with the contusions on Roderius's lips, the death was "more likely than not" a smothering. *Id.* Traylor did not take tissue samples from the buttocks, scalp, or lips that would have revealed the timing of those injuries. *Id.* at ¶ 35. After announcing that the death was a homicide, Traylor discovered that Roderius had pneumonia in all five lobes of his lungs and that his blood culture tested positive for

---

[4] Sharon Sullivan, Daniel Mars, and the City of Shreveport have been dismissed as defendants in this lawsuit. Record Document 47.

[5] Plaintiff describes this fluid as "normal." Record Document 1, ¶ 27.

[6] Traylor is not the subject of any of the motions addressed in this ruling.

alpha hemolytic streptococcus bacteria, but Traylor did not order further testing to determine if the positive blood culture was the result of sepsis. *Id.* at ¶ 36.

The Court will now address Cox, Stewart, and the Caddo Parish District Attorney's Office's Motion to Dismiss [Record Document 16], the Caddo Parish Coroner's Office and Thoma's Motion to Dismiss [Record Document 18], and Cox, Stewart, the Caddo Parish District Attorney's Office, the Caddo Parish Coroner's Office, and Thoma's Motion to Dismiss Penalty, Punitive, or Exemplary Damages [Record Document 15] in turn.

## MOTIONS TO DISMISS UNDER RULE 12(b)(6)

### I.  Legal Standard

In order to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The court must accept as true all of the factual allegations in the complaint in determining whether plaintiff has stated a plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). If a complaint cannot meet this standard, it may be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678–79.   A court does not evaluate a plaintiff's likelihood for success, but instead determines whether a plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). A dismissal under

12(b)(6) ends the case "at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

## II.   Motion to Dismiss by Cox, Stewart, and the Caddo Parish District Attorney's Office

Plaintiff asserts claims against the Caddo Parish District Attorney's Office, Dale Cox in his individual capacity and in his official capacity as the former acting District Attorney of Caddo Parish, and against James Stewart[7] in his individual capacity and his official capacity as the current District Attorney of Caddo Parish. Record Document 1, ¶s 7, 8, & 12.

In Count 1 of his complaint, Plaintiff claims that the District Attorney's Office and Cox violated his right to a fair trial. *Id.* at ¶s 81–87. According to Plaintiff, the District Attorney's Office failed to properly train and supervise Cox which allowed Cox to distort evidence, exhort Thoma and Traylor to testify falsely with "reckless disregard for the truth," improperly strike African-Americans from the jury, make "constitutionally improper" arguments at trial, and base Plaintiff's prosecution on religious and racial antipathy. *Id.*

In Count 2, Plaintiff claims that the District Attorney's Office, Cox, and Stewart violated his right to liberty without due process of law. *Id.* at ¶s 88–91. Plaintiff makes the same allegations against the District Attorney's Office and Cox in Count 2 that he does in Count 1. *Id.* Plaintiff also claims that Stewart and the District Attorney's Office acted with deliberate indifference to his civil rights and pursuant to a policy of "deliberate inaction on admittedly innocent and wrongfully convicted inmates in their jurisdiction." *Id.*

---

[7] James Stewart was the elected District Attorney of Caddo Parish at the time the Louisiana Supreme Court reversed Plaintiff's conviction and is the current District Attorney of Caddo Parish.

In Count 4,[8] Plaintiff asserts that Cox, Stewart, and the District Attorney's Office violated his right to equal treatment under the law because his investigation, detention, arrest, prosecution, and incarceration were based on intentionally unequal treatment and he is a member of a protected class. *Id.* at ¶s 92–94.

In Count 5, Plaintiff claims that Cox and the District Attorney's Office used their peremptory challenges in a racially discriminatory manner during his criminal trial by using five of seven challenges to exclude African-Americans from the jury. *Id.* at ¶s 95–97. Plaintiff claims that this exclusion allowed Cox to freely use racial stereotypes at trial which led to a violation of Plaintiff's constitutional rights.

In Count 6, Plaintiff alleges that the District Attorney's Office and Cox established policies, patterns, or practices that caused Plaintiff to be investigated, charged, detained, and prosecuted based on his race and that this led to his wrongful conviction. *Id.* at ¶s 98–102. Plaintiff claims that such policies were established with deliberate indifference and disregard for his constitutional and civil rights. *Id.* at ¶ 101.

Finally, in Counts 7 and 8, Plaintiff claims that all Defendants are liable to him under state law for intentional infliction of emotional distress and tortious interference with a parent-child relationship. *Id.* at ¶s 103–106.

In their motion to dismiss, Defendants first argue that Cox and Stewart are absolutely immune from Plaintiff's claims against them in their individual capacities under the doctrine of prosecutorial immunity. Record Document 16-1, p. 11. Defendants claim that they are not liable for any of Plaintiff's claims against the District Attorney's Office or against Cox and Stewart in

---

[8] What is referred to as Count 4 is actually the third Count listed in the complaint, meaning that Count 5 is actually the fourth count listed, et cetera.

their official capacities because Plaintiff has failed to sufficiently state a *Monell* claim for municipal liability under § 1983. *Id.* at 9 & 20. Defendants also allege that Plaintiff has no constitutional right to a fault-free investigation, fails to state a cause of action as to his claims regarding insufficient evidence, and fails to make allegations that Defendants fabricated evidence. *Id.* at 8, 16, & 22. Finally, Defendants argue that Plaintiff has not sufficiently stated a claim for relief on state law grounds and that the District Attorney's Office is not an entity that can be sued under Louisiana law. *Id.* at 23.

### A. Individual Capacity Claims

To establish § 1983 claims against Cox and Stewart in their individual capacities, Plaintiff must demonstrate (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor. *Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004). Section 1983 is violated only when a person deprives another of a constitutional or statutory right under color of state law. 42 U.S.C. § 1983 (2012); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Despite its broad reach, § 1983 was not intended to create a radical departure from ordinary common-law immunities that apply in tort suits. *Rehberg v. Paulk,* 566 U.S. 356, 361 (2012). The Supreme Court has recognized several categories of officials that are absolutely immune from lawsuits brought under § 1983 for actions taken within the legitimate scope of their duties, such as judges and legislators. *Id.* at 362. In *Imbler v. Patchman*, the Supreme Court held that prosecutors were also absolutely immune from § 1983 suits because:

> Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

424 U.S. 409, 425 (1976) (internal citations omitted).

Immunity from a § 1983 suit covers actions taken by a prosecutor in initiating prosecutions and presenting a criminal case on behalf of a state. *Id.* at 431. This immunity extends to actions taken by a prosecutor that are "intimately associated with the judicial phase of the criminal process" outside of a criminal trial. *Loupe v. O'Bannon,* 824 F.3d 534, 538 (5th Cir. 2016) (quoting *Imbler,* 424 U.S. at 430). Such actions include pretrial court appearances by a prosecutor (*Burns v. Reed,* 500 U.S. 478, 492 (1991)); the decision to file charging documents and the preparation of those documents (*Kalina v. Fletcher,* 522 U.S. 118, 129 (1997)); and administrative obligations such as training, supervision, and information management that are directly connected with the conduct of trial (*Van de Kamp v. Goldstein,* 555 U.S. 335, 344 (2009)).

Absolute immunity protects prosecutors regardless of their motives, even when they act maliciously, wantonly, or negligently. *Brummett v. Cable,* 946 F.2d 1178, 1181 (5th Cir. 1991); *Loupe,* 824 F.3d at 539 (quoting *Rykers v. Alford,* 832 F.2d 895, 897 (5th Cir. 1987)). This immunity prevents prosecutors from being held individually liable for constitutional violations resulting from actions taken within the legitimate scope of their prosecutorial duties, such as the suppression of exculpatory evidence (*Cousin v. Small,* 325 F.3d 627, 636 (5th Cir. 2003)) or state law claims such as malicious prosecution (*Loupe,* 824 F.3d at 539). Although prosecutorial immunity is broad, it is meant to protect the operations of the office itself rather than the interests of the occupant of that office. *Id.* at 538 (quoting *Kalina,* 522 U.S. at 125). When a court determines whether absolute immunity applies in a given case, it evaluates the nature of the function being performed rather than the identity of the person performing that function. *Id.* at 127.

A prosecutor's actions are not covered by absolute immunity simply because a prosecutor performs them. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273 (1993). Prosecutors are not covered by absolute immunity when they perform investigative functions normally performed by a police

officer or a detective. *Id.* A prosecutor's role in evaluating evidence and interviewing witnesses in preparation for trial is distinct from a detective's role in searching for clues and corroboration that might establish probable cause to arrest a suspect. *Id.* Investigative actions that would be covered only by qualified immunity if performed by a police officer or detective will not be covered by absolute immunity merely because they are performed by a prosecutor. *Id.* at 275.

The Supreme Court established this distinction between advocacy and investigation in *Buckley v. Fitzsimmons*. In this case, the petitioner accused prosecutors of manufacturing false evidence that linked his boot to a boot print found at the scene of a murder and shopping for experts who would confirm their theories. *Id.* at 272. The prosecutors convened a special grand jury to investigate the murder before they had probable cause to arrest the petitioner or to initiate judicial proceedings against him. *Id.* at 274. The petitioner was not arrested until ten months after the grandy jury was convened. *Id.* at 275. The Supreme Court found that the prosecutors' mission when they convened the grand jury was entirely investigative in nature and that their conduct occurred well before they could claim to be acting as advocates for the state. *Id.* The Court concluded that absolute immunity did not apply to the prosecutors' actions because:

> A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

*Id.* at 276. With these limits on the scope of absolute prosecutorial immunity in mind, the Court will now evaluate Plaintiff's claims against Cox and Stewart in their individual capacities. *See id.* at 273.

1. Claims Against Cox Individually

Most of Plaintiff's allegations against Cox in his individual capacity have to do with Cox's conduct during Plaintiff's criminal trial and are therefore barred by absolute prosecutorial immunity. Plaintiff first alleges that the prosecution at his trial, led by Cox, illegally excluded African-American jurors by using five of seven peremptory challenges to exclude African-Americans. Record Document 1, ¶s 86 & 96. While a good argument can be made that Cox did illegally exclude African-Americans from the jury,[9] this claim is directed towards actions Cox took while he was initiating and presenting a criminal case and is therefore barred by absolute immunity. *Imbler*, 424 U.S. at 430–31. Furthermore, the Fifth Circuit has explicitly held that prosecutors are absolutely immune from personal liability for using peremptory strikes in a racially discriminatory manner. *Esteves v. Brock,* 106 F.3d 674, 677 (5th Cir. 1997) ("Because Brock's use of peremptory strikes in a racially discriminatory manner was part of her presentation of the state's case, she is entitled to absolute immunity from personal liability."). Thus, this claim by Plaintiff is barred by absolute immunity.

Plaintiff further claims that Cox pursued a conviction and death sentence against him because of Cox's personal religious beliefs and mental instability even though there was insufficient evidence to support a prosecution [Record Document 1, ¶s 63–65], and that Cox made arguments based on racial stereotypes and animus [*Id.* at ¶s 66–67] and made "constitutionally improper" arguments at trial. *Id.* at ¶s 86 & 90. Again, these claims involve actions that Cox took when he was initiating a prosecution against Plaintiff and presenting the state's case against him. Absolute immunity applies to these actions regardless of motive, even if they were taken

---

[9] *Crawford*, 218 So. 2d at 18 (noting that trial court initially found a prima facie showing of a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986)).

maliciously, wantonly or negligently. *Loupe,* 824 F.3d at 539 (quoting *Rykers,* 832 F.2d at 897). Plaintiff's claims regarding Cox's mental state and his alleged animus towards Plaintiff during his criminal prosecution are barred by absolute immunity.

Plaintiff next claims that Cox, as the acting District Attorney of Caddo Parish during this prosecution and trial, adopted and implemented policies that led to unconstitutional actions, including the failure to supervise and train prosecutors to avoid wrongful convictions of African-American men. *Id.* at ¶ 12. But here again, Cox is protected by absolute prosecutorial immunity. In *Van de Kamp v. Goldstein,* the Supreme Court held that absolute immunity applied to a district attorney's alleged failure to properly train and supervise deputy district attorneys on their duty to provide impeachment-related information to a defendant because such activities required "legal knowledge and the exercise of related discretion." 555 U.S. at 344. Plaintiff's claims that Cox failed to properly train prosecutors in his office to avoid wrongful convictions of African-American men involve activities that similarly require legal knowledge and the exercise of discretion. These claims are thus barred by absolute immunity.

Plaintiff claims that Cox distorted evidence against him and exhorted Defendants Traylor and Thoma to "testify falsely with reckless disregard for truth" at trial. Record Document 1, ¶s 85 & 90. Plaintiff does not specify what evidence against him was distorted by Cox, nor what Cox told Thoma and Traylor to say that was false, although this claim likely has to do with Thoma's and Traylor's testimony about the cause of Roderius's death.[10] The Supreme Court established

---

[10] Elsewhere in his complaint, Plaintiff states that Thoma and Traylor "falsely claimed that the death was due to smothering because of the presence and pattern of injury on Roderius' lips." Record Document 1, ¶ 52.

absolute immunity for prosecutors in *Imbler v. Patchman* when it held that a prosecutor was immune from the plaintiff's claims under § 1983 that the prosecutor "with intent, and on other occasions with negligence," allowed a key witness to give false testimony at the plaintiff's criminal trial. 424 U.S. at 416. The Court acknowledged that absolute prosecutorial immunity leaves criminal defendants without civil redress when the malicious or dishonest actions of a prosecutor deprive them of liberty. *Id.* at 427. Furthermore, the Court opined that the alternative--qualified immunity for prosecutors--would endanger the functioning of the criminal justice system by preventing prosecutors from zealously performing their duties. *Id.* at 427–28. The Fifth Circuit adhered to this doctrine under similar facts in *Cousin v. Small*, where it found that a prosecutor was absolutely immune from the plaintiff's claims that he coerced and intimidated a witness into giving false testimony at the plaintiff's criminal trial. 325 F.3d at 632 & 635. Like the Supreme Court in *Imbler*, this Court acknowledges that the application of absolute prosecutorial immunity to Plaintiff's claims that Cox distorted evidence and encouraged witnesses to give false testimony against him may leave Plaintiff without civil redress for a genuine deprivation of liberty. However, the Supreme Court's holding in *Imbler* establishes that Cox is absolutely immune from these claims because they involve actions Cox took while he was initiating a prosecution and presenting the case for trial. *See Imbler*, 424 U.S. at 427–28.

Finally, Plaintiff claims that Cox should be held individually responsible for actions that he took that were not connected to the initiation of prosecution or judicial proceedings. Record Document 1, ¶ 68. According to Plaintiff, Cox "participated in the investigation of the case including searching for the clues and corroboration that gave [him] putative probable cause to have [Plaintiff] arrested and then charged with capital murder." *Id.* This claim mirrors the language used by the Supreme Court in *Buckley v. Fitzsimmons* to distinguish between the role of an advocate

and the role of a detective. 509 U.S. at 273. If Cox took on the role of a detective in his investigation of the state's case against Plaintiff, he could arguably be entitled to qualified immunity, but not absolute immunity, for such actions. *Id.* But the complaint contains no facts or further information as to the investigative actions Cox undertook. Thus, the Court does not decide the question of qualified immunity because Plaintiff's claim against Cox regarding the investigation is vague, conclusory, and does not provide enough facts to survive a motion to dismiss.

Therefore, all of Plaintiff's claims against Cox in his individual capacity are **DISMISSED WITH PREJUDICE.**

### 2. Claims Against Stewart Individually

Stewart is the current District Attorney of Caddo Parish and had replaced Cox as the acting District Attorney at the time Plaintiff's conviction was overturned. Plaintiff alleges that Stewart required him to post a $50,000 bond to secure his release from custody after the Louisiana Supreme Court reversed his conviction. Record Document 1, ¶ 74. This allegation appears to be the basis for Plaintiff's claim that Stewart acted with deliberate indifference to Plaintiff's civil rights and "pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates." *Id.*

To begin, this Court notes that the Louisiana Supreme Court did not declare Plaintiff "innocent." In fact, the Court found that there was enough evidence to support Plaintiff's conviction, but also found that his constitutional rights were violated when the district court improperly handled a *Batson* challenge. *Crawford,* 218 So. 3d at 26 & 35. During trial, the district court found that the defense's *Batson* objection constituted a prima facie case of discrimination, but the district court did not require the prosecution to provide race-neutral justifications for peremptory strikes that the defense asserted were *Batson* violations. *Id.* at 35. Instead, the district

court provided its own race-neutral justifications. *Id.* The Louisiana Supreme Court held that the error was sufficient to reverse Plaintiff's conviction and remanded the case for a new trial. *Id.* at 36. Plaintiff was required to post a $50,000 bond while Stewart decided whether to refile the criminal charges, which he ultimately decided not to do. Record Document 1, ¶ 75. Plaintiff claims that Stewart was responsible for imposing this bond. *Id.*

Plaintiff's allegation that Stewart required this bond stands in contrast to Louisiana Code of Criminal Procedure Article 314, which lists the different types of courts that have the authority to fix bail. District Attorneys do not have authority to fix bail in Louisiana. La. Code Crim. Proc. art. 314. Stewart might have requested that the state court set Plaintiff's bond at $50,000, but he could not have imposed the bond himself. Furthermore, any request Stewart made regarding Plaintiff's bond is covered by absolute immunity because it is part of the initiation and presentation of a prosecution. *Pinaud v. Cty. of Suffolk,* 52 F.3d 1139, 1149 (2d Cir. 1995) ("[W]e cannot disagree with the holding of other circuits that actions in connection with a bail application are best understood as components of the initiation and presentation of a prosecution, and therefore are protected by absolute immunity.").

Plaintiff also argues that Stewart failed to supervise and train prosecutors to determine whether a conviction is wrongful and exoneration appropriate. Record Document 1, ¶ 8. As stated above, district attorneys are absolutely immune from claims that they failed to train deputy district attorneys in areas that require legal knowledge and the exercise of related discretion. *Van de Kamp,* 555 U.S. at 344. Determining whether a conviction is wrongful and whether exoneration is appropriate clearly requires legal knowledge and Stewart is absolutely immune from these claims as well. Therefore, Plaintiff's claims against Stewart in his individual capacity are **DISMISSED WITH PREJUDICE.**

### B. Municipality/Official Capacity Claims

Plaintiff's complaint contains allegations against Cox and Stewart in their official capacities as the former acting and current District Attorneys of Caddo Parish. Record Document 1, ¶s 8 & 12. It also names as a defendant the Caddo Parish District Attorney's Office. *Id.* at ¶ 7. However, Louisiana law does not allow a district attorney's office to be sued in its own name. *Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999). Instead, claims against a district attorney's office must be brought against the current district attorney in his official capacity. *Id.* Furthermore, Cox's actions as the former District Attorney during Plaintiff's prosecution and conviction are imputed to the Caddo Parish District Attorney's Office via current District Attorney Stewart for the purposes of analyzing Plaintiff's municipal liability claims. *Ford v. Caddo Parish*, 15-0544, 2017 WL 6045465, at *2 (W.D. La. Dec. 6, 2017). Thus, procedurally, all claims against the Caddo Parish District Attorney's Office or against Cox in his official capacity as the former District Attorney of Caddo Parish must be **DISMISSED WITH PREJUDICE**. The Court will construe all such claims as claims against Stewart in his official capacity as the current District Attorney for Caddo Parish. The Court now turns to those claims. Plaintiff's municipal liability claims can be generally grouped into two categories: allegations of unconstitutional policies within the District Attorney's Office and allegations that the District Attorney's Office, Cox, and/or Stewart failed to adequately train and supervise their employees.

### 1. Policy Liability

Plaintiff claims that Cox and the Caddo Parish District Attorney's Office violated his right to liberty and to be free from punishment without due process of law by "establishing policies, patterns, or practices that they knew would deprive African-Americans such as [Plaintiff] of unbiased and fair criminal proceedings." Record Document 1, ¶ 99. These policies allegedly

harmed Plaintiff because they deprived him of a fair trial and resulted in his wrongful conviction. *Id.* at ¶ 100. According to Plaintiff, Defendants acted "unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional rights and civil rights of Mr. Crawford" by establishing these policies. *Id.* at ¶ 101. Plaintiff further alleges that the District Attorney's Office had a policy or custom that permitted prosecutors to "place racist memorabilia in their offices and defend the Confederate flag outside the courthouse." *Id.* at ¶ 60. Lastly, Plaintiff alleges that Stewart and the District Attorney's Office acted with deliberate indifference to Plaintiff's civil rights and "pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates." *Id.* at ¶s 74 & 90. The Court will examine these alleged policies individually.

> a. *Policies known to deprive African-Americans of unbiased and fair criminal investigations, arrests, and prosecutions*

Plaintiff claims that Defendants violated his constitutional rights by "establishing and maintaining policies, patterns, or practices that they knew would deprive African-Americans such as [Plaintiff] of unbiased and fair criminal investigations, arrests, and prosecutions." Record Document 1, ¶ 99. While it is well-settled law that municipal entities, like the District Attorney's Office, cannot be subject to liability under § 1983 based on *respondeat superior*, they may be sued based on constitutional harms that they caused with their policies and/or customs. Such municipal entities can be sued under § 1983 only when the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or was taken pursuant to a governmental custom, even if the custom was not officially approved. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To succeed in a claim for liability against a municipality, a plaintiff must prove the existence of a "policymaker[,] an official policy[,] and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell,* 436 U.S.

at 694). To establish the "moving force" requirement, a plaintiff must show that the municipality's policy or custom that caused the alleged harm was either unconstitutional or promulgated with deliberate indifference that a known or obvious unconstitutional consequence would result. *Id.* at 579.

Without addressing the "policymaker" and "moving force" elements of a *Monell* claim, the Court finds that Plaintiff's claims as to the existence of an "official policy" to deprive African-Americans such as Plaintiff of unbiased and fair criminal investigations, arrests, and prosecutions are vague, conclusory, and lacking in specific facts. To satisfy the "official policy" element of a *Monell* claim, a plaintiff may point to an official policy statement that was promulgated by an official policymaker or "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy." *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 169 (5th Cir. 2010) (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984)). Plaintiff has done neither.

Turning first to the existence of an official policy statement, Plaintiff fails to identify an officially promulgated statement, pattern, or practice that deprived African-Americans of fair and unbiased treatment. Plaintiff alleges that such a policy, pattern, or practice existed within the District Attorney's Office but does not identify any policy that deprived him of fair treatment. To assert a claim of municipal liability under *Monell*, "the complainant must identify the policy . . . ." *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984); *see also Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 403 (1997) (". . . we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury."). In *Spiller v. City of Texas City, Police Dep't,* 130 F.3d 162, 167 (5th Cir.

1997), the plaintiff attempted to identify policies within the Texas City Police Department that led to her arrest without probable cause, in furtherance of her § 1983 municipal liability claim. She asserted that the police department "operate[d] in a manner of total disregard for the rights of African American citizens" and "engage[d] in conduct toward African American citizens without regard to probable cause to arrest." The Fifth Circuit affirmed the district court's dismissal of these allegations, concluding that, "the description of a policy or custom and its relationship to the underlying constitutional violations . . . cannot be conclusory; it must contain specific facts." *Id.* Here, Plaintiff's allegations that the District Attorney's Office established policies, practices, or patterns that they knew would suppress the rights of African-Americans are equally conclusory.

Without a specific officially stated policy, another method by which Plaintiff can satisfy the "official policy" element of a *Monell* claim is to demonstrate the existence of an unconstitutional custom that "fairly represents a municipal policy." *Webster*, 735 F.2d at 841. To establish the existence of such a custom, a plaintiff must allege that the unconstitutional conduct occurred in cases other than his own or that a final policymaker took a single unconstitutional action. *Zarnow,* 614 F.3d at 169. Here again, Plaintiff fails to establish a *Monell* claim. Assuming that Cox was a final policy maker for the District Attorney's Office during the relevant times, Plaintiff does not identify a single unconstitutional action on the part of Cox that could establish a custom or policy that deprived African-Americans of fair and unbiased criminal proceedings. Neither does Plaintiff provide examples showing that the unconstitutional conduct he alleges occurred in other cases.

In his opposition to the motion to dismiss, but not in his complaint, Plaintiff lists three cases in which African-Americans were wrongfully convicted or sentenced in Caddo Parish, presumably in an attempt to demonstrate a pattern or practice of racial bias. Record Document 29,

p. 4. In two cases, the defendants were exonerated based on new evidence. *Id.* In the third case, a defendant was granted a new sentencing because the state's bloodstain expert gave testimony during the sentencing proceedings that contradicted the testimony he gave at trial. *Id.* These cases are not sufficiently similar to Plaintiff's case to establish a pattern or practice. Plaintiff's sentence was vacated and remanded for a new trial, but he was not exonerated or resentenced. *Crawford*, 218 So. 3d at 35. A pattern sufficient to support a *Monell* claim cannot be established by previous bad acts of the municipality unless those bad acts are specific and similar to the violation in question. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).

Because Plaintiff fails to establish the existence on an official policy statement or an unofficial policy, he cannot maintain his *Monell* claim that the District Attorney's Office established and maintained policies that they knew would deprive African-Americans of fair and unbiased criminal procedures.

> b. *Policy of placing racist memorabilia in offices and defending the Confederate flag*[11]

Plaintiff alleges that the District Attorney's Office had a policy or custom that permitted prosecutors to "place racist memorabilia in their offices and defend the Confederate flag outside the courthouse." Record Document 1, ¶ 60. He provides no more facts to support this claim. It is unclear from the complaint what Plaintiff means when he refers to prosecutors "defend[ing] the

---

[11] Plaintiff does not label his remaining policy claims as *Monell* claims, but the Court will evaluate them as such because they seek to impose § 1983 liability based on action or inaction on the part of the municipality itself. *Monell*, 436 U.S. at 694.

Confederate flag[12] outside the courthouse" or what racist memorabilia he alleges was allowed in the prosecutors' offices. Without addressing two of the requirements for municipal liability—the existence of a policy maker and a policy that was the "moving force" behind a constitutional violation—the Court finds that Plaintiff fails to sufficiently plead the existence of a policy as required for a claim of municipal liability. *Monell*, 436 U.S. at 694. In his complaint, Plaintiff fails to allege enough facts, or any facts at all, to make this claim to relief plausible on its face. *Iqbal*, 556 U.S. at 678.

Plaintiff elaborates on these allegations in his opposition to Defendants' motion to dismiss. Plaintiff states that the culture of the District Attorney's Office was such that one Assistant District Attorney felt comfortable "hanging a large portrait of Nathan Bedford Forrest, a Confederate general and early leader of the Ku Klux Klan, on the wall." Record Document 29, p. 4. Plaintiff also states that the District Attorney's Office overlooks a courthouse that has a monument to the confederacy, including a stone slab inscribed with the Confederate flag. *Id.* at 3–4. Plaintiff does not allege any connection between the confederate monument and the District Attorney's Office other than proximity. As his source for these details, Plaintiff cites an article published by *The New Yorker. Id.* at 3. Although these details provide additional facts to support Plaintiff's allegations, the Court is limited to evaluating the face of the complaint on a motion to dismiss pursuant to Rule 12(b)(6). *Iqbal*, 556 U.S. at 678. Even if the Court could consider these additional facts, Plaintiff provides the Court with no authority establishing that these claims could be the basis of municipal liability under *Monell*. The Court acknowledges that Plaintiff's allegations, if true, are deeply

---

[12] There is a Confederate monument, but not a Confederate flag, outside the courthouse of the First Judicial District Court, Caddo Parish where Plaintiff was convicted. The monument does contain a plaque into which a Confederate flag is inscribed.

concerning. However, Plaintiff has failed to provide enough facts to state a claim that the Caddo Parish District Attorney's Office had a policy that allowed prosecutors to "place racist memorabilia in their offices and defend the Confederate flag outside the courthouse." *See* Record Document 1, ¶ 60.

### c. *Policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates*

In enumerating his claims against Stewart in his official capacity, Plaintiff alleges the following:

> It was not until the Supreme Court of Louisiana issued an opinion reversing Mr. Crawford's conviction that Mr. Crawford was released, and even then Defendant STEWART required Mr. Crawford's family to shoulder payment of a $50,000 bond to secure his release. Defendants STEWART and the DISTRICT ATTORNEY'S OFFICE acted with deliberate indifference to Mr. Crawford's civil rights and pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates in its jurisdiction.

Record Document 1, ¶ 74 (in its entirety). From this paragraph, it is clear that Plaintiff's policy-based allegations against Stewart relate to the $50,000 bond Plaintiff was required to post in order to secure his release from custody. As stated earlier in this ruling, District Attorneys do not have the authority to set an amount of bond under Louisiana law. *Supra*, Part II.A.2; La. Code Crim. Proc. art. 314. Plaintiff's claims that the District Attorney's Office acted "pursuant to a policy of deliberate inaction on admittedly innocent and wrongfully convicted inmates" cannot attach to the District Attorney's Office with regard to setting bond. To the extent that Plaintiff's complaint faults the District Attorney's Office for requesting bond from inmates, he fails to state a valid claim for municipal liability.

Plaintiff fails to identify a specific policy that this court can evaluate under *Monell*. Plaintiff does not allege which actions the District Attorney's Office should take regarding "admittedly innocent and wrongfully convicted inmates," nor has he alleged any other instances of "deliberate

inaction" that might show an informal policy, pattern, or practice. *Monell*, 436 U.S. at 694. Because

the Louisiana Supreme Court remanded his case for a new trial but did not vacate his conviction,

Plaintiff fails to show that he qualifies as an "admittedly innocent" inmate. *Crawford*, 218 So. 3d

at 26 & 35. It is insufficient for a plaintiff to merely add the words "policies . . . and/or customs"

to his or her allegations, as Plaintiff has done here. *See Whitley v. Hanna*, 726 F.3d 631, 649 (5th

Cir. 2013) (citing *Spiller*, 130 F.3d at 167). Plaintiff has failed to state a plausible claim that the

District Attorney's Office maintained a policy, pattern, or practice of "deliberate inaction on

admittedly innocent and wrongfully convicted inmates."

### d. Pleading standard for municipal liability claims

In his opposition, Plaintiff argues that only minimal factual allegations should be required

from plaintiffs making a *Monell* claim at the motion to dismiss stage. Record Document 29, p. 9.

Plaintiff urges this Court to adopt the approach taken by the Southern District of Texas in *Brown*

*v. City of Houston,* when it stated that,

> [I]t is exceedingly rare that a plaintiff will have access to (or personal knowledge
> of) specific details regarding the existence or absence of internal policies or training
> procedures prior to discovery. Accordingly, only minimal factual allegations
> should be required at the motion to dismiss stage. Moreover, those allegations need
> not specifically state what the policy is, as the plaintiff will generally not have
> access to it, but may be more general.

*Brown v. City of Houston,* 297 F. Supp. 3d 748, 767 (S.D. Tex. 2017), *reconsideration denied sub*

*nom. Brown v. City of Houston, Texas,* No. CV H-17-1749, 2018 WL 1333883 (S.D. Tex. Mar.

15, 2018)) (quoting *Thomas v. City of Galveston,* 800 F. Supp. 2d 826, 843 (S.D. Tex. 2011)

(Ellison, J.). The Court rejects this argument for two reasons. First, this Court is bound by the

decisions of the Fifth Circuit, not the decisions of its fellow district courts. Second, the plaintiff in

*Brown* was able to identify a specific policy and provide examples of that policy, which Plaintiff

has not done in this case. *See Brown*, 297 F. Supp. 3d at 766. This Court will not adopt the pleading standard for municipal liability claims that Plaintiff proposes.

### e. Claim introduced in Plaintiff's opposition

Plaintiff's opposition in response to Defendants' motion for summary judgment contains several statements that appear to assert an additional *Monell* claim: that the Caddo Parish District Attorney's Office had a policy of excluding African-Americans from juries. Plaintiff states two separate times that Defendants "oversaw an office with a custom of persistent and widespread discriminatory practices *that led to the illegal exclusion of African Americans from juries* . . . ." Record Document 29, pp. 3 & 8 (emphasis added). Plaintiff's complaint contains allegations that the District Attorney's Office failed to train its prosecutors to refrain from illegally excluding African-American jurors. Record Document 1, ¶ 59. A failure to train claim is separate from a claim that a policy is unconstitutional and is evaluated under a different set of factors. Because Plaintiff did not allege in his complaint that the Caddo Parish District Attorney's Office had a policy, pattern, or practice of excluding African-Americans from juries, the Court has not evaluated such a claim. To the extent that Plaintiff attempts to assert such a claim in his opposition, the Court cannot consider it.[13]

However, even if the Court could consider this claim, Plaintiff would not prevail. Plaintiff's conviction was overturned by the Louisiana Supreme Court based on an error made by the district court judge. *Crawford*, 218 So. 2d at 32. As set forth by the Louisiana Supreme Court in *Crawford*, the evaluation of a *Batson* challenge requires three steps:

---

[13] Arguably, a pattern or practice of excluding African-Americans from juries represents a specific example of Plaintiff's very general allegation that the District Attorney's Office established and maintained policies, patterns, or practices that it knew would deprive African-Americans such as himself of unbiased and fair criminal investigations, arrests, and prosecutions.

1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;

2) if the requisite showing has been made, the prosecution "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result,'" and

3) in light of the parties' submissions, the trial court must determine if the "defendant has established purposeful discrimination."

*Id.* at 30 (quoting *State v. Green*, 94-0887, p. 23 (La. 5/22/95), 655 So. 2d 272, 287). Instead of following this framework, the district judge intervened after the first step was completed. *Id.* at 32. After announcing that the defense had made a prima facie claim of discrimination, the district court proceeded to offer and affirm race-neutral reasons for each of the seven peremptory strikes exercised by the prosecution instead of requiring the prosecution to provide race-neutral reasons for each strike. *Id.* It was the district judge's actions, not the actions of Cox or any other prosecutor, that led the Louisiana Supreme Court to overturn Plaintiff's conviction. We will never know whether Cox would have been able to enunciate race-neutral reasons sufficient to overcome the defense's initial showing of discrimination. It would be mere speculation to allow Plaintiff to continue with a claim based on Cox's actions during trial that were never determined to be unconstitutional. Therefore, this claim cannot survive the instant motion to dismiss.

2. Failure-to-Train Liability

In addition to claiming that the District Attorney's Office had unconstitutional policies, Plaintiff also claims that it failed to train prosecutors properly and that this failure resulted in the violation of his constitutional rights. Plaintiff alleges that the District Attorney's Office failed to properly train and supervise its employees to refrain from illegally excluding African-American jurors and to avoid racism in evaluating, charging, and prosecuting cases. *Id.* at ¶s 59–60. He also alleges a failure to train and supervise prosecutors to avoid wrongful convictions and death

sentences. *Id.* at ¶ 61. Plaintiff asserts that the District Attorney's Office's failure to train and

supervise Cox led to a prosecution based on religious and racial antipathy rather than factual

evidence. *Id.* at ¶ 84. Plaintiff claims that this same lack of training and supervision led Cox to

distort evidence and to exhort Defendants Thoma and Traylor to testify falsely at trial. *Id.* at ¶ 85.

To establish a failure-to-train claim giving rise to municipal liability under § 1983, a

plaintiff must demonstrate: (1) inadequate training procedures; (2) that inadequate training caused

a violation of the plaintiff's constitutional rights; and (3) the deliberate indifference of municipal

policymakers. *Pineda v. City of Hous.*, 291 F.3d 325, 331–32 (5th Cir. 2002). Deliberate

indifference requires actual or constructive notice that a particular omission in a training program

would cause city employees to violate citizens' constitutional rights, yet the municipality

nevertheless chooses to retain that program. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A

pattern of similar constitutional violations by untrained employees is ordinarily necessary to

demonstrate deliberate indifference. *Id.* at 62. "Without notice that a course of training is deficient

in a particular respect, decision makers can hardly be said to have deliberately chosen a training

program that will cause violations of constitutional rights." *Id.*

Plaintiff alleges that there was a pattern of unconstitutional conduct but does not provide

other instances of constitutional violations caused by the Caddo Parish District Attorney's Office's

failure to train Cox and other prosecutors. Record Document 1, ¶s 59, 60, 61, & 84–85. In their

motion to dismiss, Defendants argue that Plaintiff's allegations involving a failure to train or

supervise are too vague to survive a motion to dismiss under Rule 12(b)(6). Record Document 16-

1, p. 17. Specifically, Defendants argue that Plaintiff has not provided any other examples of the

actions and inactions he alleges as policy other than the one at issue in this case, which is not

sufficient to demonstrate the deliberate indifference required for a failure-to-train claim under

*Monell. Id.* at 11. In his opposition, Plaintiff argues that he has provided specific facts to show that his prosecution was infected with racial bias and that, despite a history of racial disparity in its application of the death penalty, the District Attorney's Office failed to train and supervise its lawyers not to base prosecutions on race, religion, and distorted evidence. Record Document 37, pp. 8–9.

The Supreme Court outlined the requirements of a failure-to-train claim brought against a district attorney's office in *Connick v. Thompson*, 563 U.S. at 61. In *Connick*, the Supreme Court found that a district attorney's office could not be held responsible under § 1983 for failing to train its prosecutors based on a single *Brady*[14] violation. *Id.* at 54. Thompson, the plaintiff, claimed that a lack of adequate training caused the Orleans Parish District Attorney's Office to fail to disclose exculpatory evidence during his criminal prosecution. *Id.* The plaintiff in *Connick* identified four convictions that were overturned because of *Brady* violations committed by prosecutors in Connick's office in the previous ten years before his trial. *Connick*, 563 U.S. at 62. The Court found that these *Brady* violations did not involve the type of evidence at issue in Thompson's case and thus could not have put Connick on notice of the need for further *Brady* training with respect to the type of violation the plaintiff alleged. *Id.* at 63. The Court also found that a failure to train claim against prosecutors could not result in single-incident[15] liability because of the extensive

---

[14] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution).

[15] In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court held that in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference in a failure-to-train claim. *Connick*, 563 U.S. at 63. The Court provided a hypothetical in which a city armed its police officers with firearms and deployed them to capture fleeing felons without training them on the constitutional limits of deadly force. *Id.* The Court held that such

training, character and fitness, and ethical requirements to which prosecutors are subject. *Id.* at 67. Finally, the Court held that single-incident liability was not appropriate in this case, even if more training on *Brady* would have been helpful, because prosecutors were familiar with the general rule of *Brady*. *Id.* at 68. Under *Connick*, a § 1983 claim against a district attorney's office for failure to train will not be successful when that claim does not allege similar constitutional violations or alleges a theory of single-incident liability.

Not only does Plaintiff fail to assert a pattern of similar constitutional violations, but his claims involving a failure to train are vague and conclusory. For a municipality to be liable for a failure to train or inadequate training of its employees, a plaintiff must allege with specificity how a particular training program is defective. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). A claim will not survive if a plaintiff merely proves that better or more training could have prevented the injury. *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). Because he does not provide examples of similar constitutional violations and allege with specificity how the District Attorney's Office's training programs were ineffective, Plaintiff has not stated a viable failure-to-train claim.

### 3. Conclusion: Municipal Liability Claims

Plaintiff's claims against the Caddo Parish District Attorney's Office, Cox in his official capacity, and Stewart in his official capacity, all construed as claims against Stewart in his official capacity, are replete with legal conclusions disguised as factual allegations. *See Iqbal*, 556 U.S. at 678. As such, they are all too vague and conclusory to survive a motion to dismiss. *Id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by

---

actions on the part of a municipality could reflect an indifference to the "highly predictable consequence" that constitutional rights would be violated. *Id.*

factual allegations."). Plaintiff's claims against Stewart in his official capacity as the current District Attorney of Caddo Parish are hereby **DISMISSED WITH PREJUDICE.**

### C. State Law Claims

1. Intentional Infliction of Emotional Distress

Plaintiff asserts a claim of intentional infliction of emotional distress under Louisiana state law against all Defendants. Record Document 1, ¶s 103–104. He states that he experienced emotional distress because of the "extreme and outrageous conduct" of Defendants. *Id.* at 104. In order to recover for intentional infliction of emotional distress in Louisiana, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Sabre Indus., Inc. v. Module X Sols., LLC*, 15-2501, 2017 WL 4183070, at *3 (W.D. La. Sept. 19, 2017) (quoting *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991)). The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . ." *Id.*

Plaintiff cannot maintain this claim against Cox, Stewart, or the Caddo Parish District Attorney's Office.[16] Although the intentional infliction of emotion distress is a state law tort, the Louisiana Supreme Court has adopted the federal rule of absolute immunity for prosecutors. *Lester v. Caddo Parish*, 15-2008, 2016 WL 6270767, at *5 (W.D. La. Oct. 26, 2016) (quoting *Knapper*

---

[16] Because Plaintiff brings this claim against all Defendants, the Court assumes this claim to be against Cox and Stewart in their individual and official capacities, and against the Caddo Parish District Attorney's Office. However, as previously stated, Plaintiff's claims against Cox in his official capacity and the Caddo Parish District Attorney's Office are construed as claims against Stewart in his official capacity. *See supra*, part II.B.

*v. Connick*, 681 So. 2d 944, 950 (La. 1996)). In *Knapper*, the Court adopted the United States Supreme Court's reasoning in *Imbler v. Patchman*, 424 U.S. 409, and found that prosecutors were absolutely immune from claims regarding conduct within the course and scope of their prosecutorial functions, including claims of malicious prosecution. 681 So. 2d at 950. Federal district courts in Louisiana have held that this absolute immunity extends to claims of intentional infliction of emotional distress when such claims are predicated on acts shielded by absolute immunity. *Cousin v. Small*, CIV. A. 00-0069, 2001 WL 617455, at *9 (E.D. La. June 4, 2001); *Adams v. City of New Orleans*, 15-1543, 2016 WL 4272711, at *8 (E.D. La. Aug. 15, 2016); *Lester*, 2016 WL 6270767, at *5.

Like the Court in *Imbler*, the Louisiana Supreme Court in *Knapper* held that the application of absolute immunity depends on the function that a prosecutor was performing when the alleged misconduct occurred. 681 So. 2d at 950. A prosecutor is not absolutely immune from intentional infliction of emotional distress claims predicated on actions taken in an investigatory role that are not covered by absolute immunity. *Adams*, 2016 WL 4272711, at *8. As discussed *supra*, Stewart and Cox are absolutely immune from Plaintiff's claims against them in their individual capacities with the exception of Plaintiff's claim that Cox participated in the investigation of his case, which was insufficiently plead, as discussed above. *See supra* Parts II.A.1 & II.A.2. Therefore, Plaintiff's claim of intentional infliction of emotional distress against Cox in his individual capacity and against Stewart in his individual and official capacities is **DISMISSED WITH PREJUDICE**.

2. Tortious Interference with the Parent-Child Relationship

Plaintiff asserts a claim of tortious interference with the parent-child relationship against all Defendants.[17] Record Document 1, ¶s 105–106. As stated above, prosecutors in Louisiana have absolute immunity from claims based on actions taken within the scope of their prosecutorial duties. *Knapper*, 681 So. 2d at 950. Although Cox is not absolutely immune from Plaintiff's claims that he participated in the investigation of Plaintiff's case, this claim fails because Louisiana does not recognize "tortious interference with the parent-child relationship" as a tort. At least one Louisiana court has considered issues relating to interference in a parent-child relationship in the context of family law and custody disputes. *See Pulley v. Pulley*, 587 So. 2d 116, 120 (La. App. 2 Cir. 1991). However, such interference has not been recognized as a tort in Louisiana jurisprudence. Because Plaintiff does not allege a tort recognized under Louisiana law, he does not state a valid claim to relief and his claim of tortious interference against Cox in his individual capacity and against Stewart in his individual and official capacities is therefore **DISMISSED WITH PREJUDICE**.

III. **Motion to Dismiss by Coroner Todd G. Thoma and the Caddo Parish Coroner's Office**

Plaintiff brings claims under § 1983 against Thoma, the Coroner of Caddo Parish, and the Caddo Parish Coroner's Office. The heart of Plaintiff's allegations is that Thoma performed a negligent examination and reached incorrect scientific conclusions. Plaintiff contends that Thoma deprived him of his right to a fair trial, deprived him of liberty without due process of law, and deprived him of equal protection under the law. Record Document 1, ¶s 83, 85, 91, & 93. Plaintiff

---

[17] Again, the Court construes claims against the Caddo Parish District Attorney's Office and Cox in his official capacity as claims against Stewart in his official capacity.

asserts that Thoma had a preconceived notion that Roderius had been smothered, based on the race of the parties involved and the neighborhood in which they lived, when he was called to the emergency room to examine the body. *Id.* at ¶ 33. Plaintiff alleges that Thoma was influenced by "confirmation bias," that his preconceived expectations were based on race and racism, and that he operated with deliberate indifference to accepted professional standards of practice. *Id* at ¶ 40. Finally, Plaintiff alleges that Thoma falsely claimed that Roderius' death was due to smothering without factual support. *Id.* at ¶s 52 & 83.

Thoma and the Caddo Parish Coroner's Office filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted or, alternatively, a motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). Record Document 18-1, p. 9. Because the Court will grant the motion to dismiss, it will not address the motion for a more definite statement. Defendants argue that their motion should be granted because (1) Thoma is entitled to absolute immunity as a witness at Plaintiff's criminal trial, and absolute or at least qualified immunity as the coroner in this matter; (2) Plaintiff does not have a constitutional right to a fault-free investigation; (3) Plaintiff has not sufficiently stated a policy, custom, or practice that would sustain a *Monell* claim; (4) Plaintiff fails to properly state a valid Fourteenth Amendment claim; (5) Plaintiff's claim is merely re-litigating issues that were settled in his criminal case; and (6) the Coroner's Office is not an entity capable of being sued. *Id.* at pp. 14–32.

## A. Individual Capacity § 1983 Claims

To establish liability under § 1983, there must be (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor. *Larpenter,* 369 F.3d at 482. Thoma claims that he is protected from all of Plaintiff's § 1983 claims against him in an individual capacity by either absolute or qualified immunity. Record Document

18-1, p. 14. The Court will examine first whether Thoma is covered by absolute immunity, and then whether he is covered by qualified immunity.

### 1. Absolute Immunity

#### a. *Absolute immunity for trial testimony*

Some of Plaintiff's claims against Thoma appear to involve testimony that he gave during Plaintiff's criminal trial. Plaintiff makes several references to Thoma making false statements. *See* Record Document 1, ¶s 52 & 85. The Court agrees with Thoma that he is absolutely immune from § 1983 liability for statements he made during trial. *See* Record Document 18-1, p. 16. In *Briscoe v. LaHue*, the Supreme Court held that the same principles used to establish absolute immunity for judges and prosecutors apply to trial witnesses. 460 U.S. 325, 345 (1983). The Court found that there was no evidence that the drafters of the statute that became § 1983 intended that legislation to abrogate witness immunity. *Id.* at 339. The Fifth Circuit has also recognized the "well-established" rule that witnesses have absolute immunity for their testimony at trial. *Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003). However, it should be noted Thoma's absolute immunity from claims involving his testimony at trial does not provide protection from claims involving his pre-testimonial investigative activities. *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003).

#### b. *Absolute immunity for all other claims*

In addition to claiming absolute immunity for his trial testimony, Thoma asserts that, as the duly elected Coroner for Caddo Parish, he is a member of the judiciary and therefore entitled to absolute immunity for all of his actions in this case. Record Document 18-1, p. 14–15. The office of coroner is established in Article V, § 29 of the Louisiana Constitution. *La. Const. art. V, § 29.* Article V of the Louisiana Constitution does govern the Judicial Branch, but as Plaintiff

points out in his opposition, sheriffs are similarly classified in Louisiana's constitutional scheme. *La. Const. art. V, § 27*; Record Document 28, p. 5. Clearly sheriffs are not members of the judiciary simply because the office of sheriff is established in Article V of the Louisiana Constitution, and neither are coroners. Furthermore, the Supreme Court has generally held that absolute immunity is reserved for "exceptional situations." *Butz v. Economou,* 438 U.S. 478, 507 (1978). The Court has been "quite sparing" in its recognition of claims to absolute official immunity. *Forrester v. White,* 484 U.S. 219, 224 (1988). This Court finds no grounds for extending absolute immunity to the office of coroner.

### 2. Qualified Immunity

Thoma raises qualified immunity as a defense to Plaintiff's § 1983 claims against him in his individual capacity. Record Document 18-1, p. 17. It is well established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Plaintiff argues that Thoma is not entitled to qualified immunity because Plaintiff's constitutional rights to a fair trial, equal protection, and due process are well established. Record Document 28, p. 7.

#### a. *Qualified Immunity standard*

Once qualified immunity has been raised by a defendant, the burden is then upon the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002) (en banc). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Id.* Accordingly, the issue of whether qualified immunity applies should be resolved at the earliest possible stage in the litigation. *Porter v. Epps,* 659 F.3d 440, 445 (5th

Cir. 2011). Resolving the issue early serves to protect officials from unwarranted liability and "costly, time-consuming, and intrusive" pre-trial discovery. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

The defense of qualified immunity involves a two-part inquiry: (1) whether the facts alleged or shown by the plaintiff demonstrate a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Harlow*, 457 U.S. at 818. "The constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right." *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998). A public official may assert the defense of qualified immunity even though a plaintiff's civil rights have been violated, provided that the official's conduct was objectively reasonable. *Id.* at 467. The standard of "objective reasonableness" ensures that officers are on notice that their conduct is unlawful before they are subjected to a lawsuit. *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Whether the actions of the official are objectively reasonable turns on the circumstances confronting the official as well as "clearly established law" in effect at the time of the official's conduct. *Id.* at 243. "The subjective intent of the officer is irrelevant, and the officer's knowledge of the law need not rise to the level of a 'constitutional scholar.'" *Sanchez,* 139 F.3d at 467 (citing *Harlow*, 457 U.S. at 815–17). A court may begin its analysis of qualified immunity with either prong. *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014).

### b. *Application of the Qualified Immunity standard*

The Court finds that Plaintiff fails to show or allege facts demonstrating that Thoma violated Plaintiff's clearly established constitutional rights to a fair trial, due process, or equal protection. Before evaluating Plaintiff's claims under a qualified immunity analysis, the Court notes that many of Plaintiff's claims against Thoma are legal conclusions couched as facts.

*Papasan*, 478 U.S. at 286. Plaintiff argues that Thoma violated his constitutional rights because Thoma believed that Roderius had been smothered before he began examining the body, in violation of "accepted professional standards of practice." Record Document 1, ¶s 33 & 43. Plaintiff claims that Thoma reached this conclusion because of "confirmation bias" caused by his racial and neighborhood prejudices. *Id.* at ¶s 33 & 40. However, Plaintiff offers no specific facts to support these assertions other than Thoma's finding that Roderius died due to suffocation, which Plaintiff alleges was false and made without factual support. *Id.* at ¶s 52 & 83. Plaintiff's speculations about Thoma's mindset, without more, are not sufficient to show a constitutional violation.

Even if Plaintiff had provided enough facts to show that Thoma acted negligently, qualified immunity would still bar his claims. Coroners generally enjoy qualified immunity when acting within the scope of their duties. *Lawyer v. Kernodle*, 721 F.2d 632, 635 (8th Cir. 1983). Even a coroner who performs a negligent autopsy does not violate a criminal defendant's clearly established constitutional rights. *Id.*; *Galbraith v. Cty. of Santa Clara*, 99-20887 SW, 2000 WL 1793164 at * 2 (N.D. Cal. July 19, 2000), *rev'd on other grounds*, 307 F.3d 1119 (9th Cir. 2002). Plaintiff has failed to provide the Court with any authority showing that a criminal defendant's right to a non-negligently performed autopsy is clearly established under federal law. *Galbraith*, 2001 WL 1793164 at *2.

In his opposition, Plaintiff argues that Thoma "participated in the development and ultimately approved of 'manufactured evidence'—the autopsy of Roderius Crawford." Record Document 28, p. 8. The Fifth Circuit has previously held that, "the deliberate or knowing creation of misleading and scientifically inaccurate [evidence] amounts to a violation of a defendant's due process rights." *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008). However, Plaintiff's argument

that Thoma reached an incorrect medical conclusion during his examination of Roderius's body is not sufficient to show that Thoma manufactured evidence or to overcome qualified immunity.

The Fifth Circuit has held that negligent forensic work in a criminal case will not defeat a claim of qualified immunity. *Brewer v. Hayne*, 860 F.3d 819, 825 (5th Cir. 2017). In *Brewer v. Hayne*, the Fifth Circuit upheld a grant of summary judgment in favor of two forensic consultants who provided information in the plaintiffs' criminal investigations that later turned out to be baseless. *Id.* Defendants Hayne, a private pathologist who performed autopsies for the State of Mississippi, and West, a dentist and forensic odontologist with whom Hayne consulted, concluded in two separate murder investigations that bite marks found on the bodies of the victims matched teeth patterns attributable the plaintiffs. *Id.* at 821–22. The plaintiffs, Brewer and Brooks, were convicted of murder but their convictions were later vacated based on new evidence. *Id.* Brewer and Brooks sued Hayne and West under § 1983. *Id.* at 821.

The Fifth Circuit found that the plaintiffs had presented sufficient evidence to show that the defendants were negligent in their forensic analysis but had not shown that the defendants had an intent to fabricate evidence, which would constitute a due process violation. *Id.* at 825; *Brown*, 519 F.3d at 237. The court held that negligence alone would not defeat qualified immunity. *Id.* Thus, Hayne and West were entitled to qualified immunity for their potentially negligent and inaccurate medical conclusions.

Unlike the plaintiffs in *Brewer*, who were attempting to present sufficient evidence to survive a motion for summary judgment on the issue of qualified immunity, Plaintiff in this case is not required to present any evidence in order to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). However, Plaintiff is required to plead factual content that allows the Court to draw a reasonable inference that Defendants are liable for the misconduct alleged.

*Iqbal*, 556 U.S. at 678. In the case at hand, Plaintiff has not pleaded sufficient facts to state a claim that Thoma intentionally fabricated or manufactured evidence during his examination of Roderius's body. At most, Plaintiff has pleaded facts alleging that Thoma was possibly incorrect and/or negligent in concluding that Roderius died due to suffocation. As the Fifth Circuit held in *Brewer*, negligence alone will not defeat qualified immunity. *Brewer*, 860 F.3d at 825.

Because Plaintiff has not pleaded specific facts that could plausibly show that Thoma is not entitled to qualified immunity or facts that suggest Thoma violated his constitutional rights, he has failed to state a claim to relief against Thoma under § 1983. *Larpenter*, 369 F.3d at 482. Plaintiff's claims against Thoma is his individual capacity are therefore **DISMISSED WITH PREJUDICE.**

### B. Official Capacity § 1983 Claims

Plaintiff asserts § 1983 claims against the Caddo Parish Coroner's Office and against Thoma in his official capacity as the Coroner of Caddo Parish. Record Document 1, ¶s 4–5. A threshold question is whether or not the proper party to a claim asserted against the Coroner's Office is Thoma in his official capacity as the elected Coroner of Caddo Parish or the Caddo Parish Coroner's Office itself. This Court could not discern a firm answer to this question from Louisiana statutory or case law.[18] The Court need not reach an answer to this question because all of Plaintiff's claims against Thoma and the Caddo Parish Coroner's Office are dismissed.

Plaintiff alleges that the Coroner's Office and Thoma followed a policy, practice, or custom of "inadequately investigating the death of Roderius," which permitted Thoma and Traylor to rule the death a homicide and caused Plaintiff to be charged with homicide. Record Document

---

[18] *But see Ford v. Parish*, 15-0544, 2017 WL 6626475 at *4 n.4 (W.D. La. Dec. 28, 2017) (stating that the current elected coroner is the proper party for a claim against a Coroner's Office).

1, ¶ 90. Plaintiff claims that the Coroner's Office acted to deny him equal protection under the law and "establish[ed] and maintain[ed] policies, patterns or practices that they knew would deprive African-Americans such as Mr. Crawford of unbiased and fair criminal investigations, arrests, and prosecutions." *Id.* at ¶s 93 & 99. Plaintiff argues that these policies violated his right to liberty and to be free from punishment without due process of law. *Id.* at 99.

As stated previously, municipal entities can be sued under § 1983 only when the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or was taken pursuant to a governmental custom, even if the custom was not officially approved. *Monell*, 436 U.S. at 690. To impose liability on a municipality under § 1983, a plaintiff must prove the existence of three elements: a "policymaker[,] an official policy[,] and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (citing *Monell,* 436 U.S. at 694). An "official policy" can be evidenced through "duly promulgated policy statements, ordinances or regulations," or by a custom that is such a persistent and widespread practice that, although not officially promulgated, it fairly represents a municipal policy. *Webster,* 735 F.2d at 841; *see also Zarnow*, 614 F.3d at 168–69.

Plaintiff's claims of municipal liability against Thoma and the Coroner's Office suffer from the same defects as his municipal liability claims against the District Attorney's Office. Setting aside the policymaker and "moving force" elements, Plaintiff again fails to identify any "official policy" that violated his rights. Plaintiff claims that the Coroner's Office established policies that would deprive African-Americans of their rights, but he does not say what those policies were. He alleges that Thoma and the Coroner's Office acted pursuant to a policy of "inadequate investigation," but these allegations are equally void of facts showing a specific policy. To assert

a claim of municipal liability under *Monell*, "the complainant must identify the policy." *Bennett*, 728 F.2d at 767; *see also Bd. of Cty. Com'rs of Bryan Cty.,* 520 U.S. at 403 (. . . we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury.).

Plaintiff also cannot satisfy the "official policy" element of a *Monell* claim by showing a widespread custom that "fairly represents" a municipal policy. *Webster,* 735 F.2d at 841. To establish the existence of such a custom, a plaintiff must allege that the unconstitutional conduct occurred in cases other than his own or that a final policy maker took a single unconstitutional action. *Zarnow,* 614 F.3d at 169. Plaintiff offers no facts to suggest that the unconstitutional conduct he alleges against Thoma and the Coroner's Office happened in other cases. Plaintiff also does not identify a single unconstitutional action on the part of Thoma, as the final policymaker for the Coroner's Office, that could establish a custom or policy. Because Plaintiff has failed to provide enough facts to satisfy the "official policy" element of a *Monell* claim, he cannot assert a § 1983 for municipal liability. Plaintiff's claims against Thoma in his official capacity and against the Caddo Parish Coroner's Office are **DISMISSED WITH PREJUDICE.**

## C. State Law Claims

### 1. Intentional Infliction of Emotional Distress

Plaintiff includes Thoma and the Caddo Parish Coroner's Office in his state tort claims for intentional infliction of emotional distress and tortious interference in a parent-child relationship. Record Document 1, ¶s 103–106. These claims cannot survive this motion to dismiss for several reasons. First, Louisiana law provides coroners with a limited immunity:

> I. (1) Liability shall not be imposed on an elected coroner or his support staff based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

(2) The provisions of Paragraph (1) of this Subsection are not applicable to any of the following:

> (a) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
>
> (b) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

(3) The legislature finds and states that the purpose of this Subsection is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.

La. Stat. Ann § 13:5713(I).

The majority of Plaintiff's claims against Thoma involve actions that he took while performing discretionary acts that were within the scope of his powers and duties under this statute. Louisiana law requires a coroner to view a body or conduct an investigation in cases involving, *inter alia*, "[s]uspicious, unexpected, or unusual deaths[,] . . . [d]eaths due to unknown or obscure causes or in any unusual manner[,] . . . [d]eaths due to a suspected homicide[,] . . . [and] [d]eaths due to . . . suffocation[] or smothering." *Id.* § 13:5713(A)(1), (3), (5), and (9). When there is a "reasonable probability that the violation of a criminal statute has contributed to the death," a coroner must perform an autopsy. *Id.* § 13:5713(B)(1). Following an investigation or autopsy, a coroner must furnish a death certificate stating the cause of death "as best he can." *Id.* § 13:5713(E)(1); *Newsome-Goudeau v. Louisiana*, 17-909, 2018 WL 1462110 at *2 (W.D. La. March 23, 2018). Most of the allegations Plaintiff brings against Thoma, involving his conclusions about the cause of Roderius's death and the alleged bias that influenced those conclusions, were taken within the context of his duties as coroner and Plaintiff has not provided enough facts to show that his actions constituted "criminal, fraudulent, malicious, intentional, willful, outrageous, or flagrant misconduct." § 13:5713(I)(2)(b). Therefore, this coroner immunity bars most of Plaintiff's claims against Thoma. Plaintiff's claims against Thoma regarding his testimony at trial

are barred by the absolute immunity for witnesses that exists under Louisiana law. *Texas Brine Co., LLC v. Am. Arbitration Assoc., Inc.*, 18-6610, 2018 WL 5773064 at * 3 (E.D. La. Nov. 2, 2018) (citing *Marrogi v. Howard*, 2001-CQ-1106, (La. 1/15/02); 805 So. 2d 1118, 1127). Therefore, the Court finds that Plaintiff cannot maintain his intentional infliction of emotional distress claim against Thoma in his individual or official capacity or against the Caddo Parish Coroner's Office and these claims are therefore **DISMISSED WITH PREJUDICE.**

2. Tortious Interference with the Parent-Child Relationship

Plaintiff asserts a claim of tortious interference with the parent-child relationship against all Defendants. Record Document 1, ¶s 105–106. As stated above, coroners in Louisiana have immunity from claims based on actions taken within the scope of their statutorily mandated duties and witnesses are protected by absolute immunity. La. Stat. Ann § 13:5713(I); *Marrogi*, 805 So. 2d at 1127–28. This claim also fails because Louisiana does not recognize "tortious interference with the parent-child relationship" as a tort. As discussed previously, although interference in a parent-child relationship has been considered as a factor in family law disputes, it is not a recognized tort under Louisiana law. *See Pulley v. Pulley*, 587 So. 2d 116, 120 (La. App. 2 Cir. 1991). Because he does not allege a tort recognized under Louisiana law and because of coroner and witness immunity under Louisiana law, the Court finds that Plaintiff cannot maintain his tortious interference claim against Thoma in his individual or official capacity or against the Caddo Parish Coroner's Office and these claims are therefore **DISMISSED WITH PREJUDICE.**

IV. **Khasiah Crawford's claims**

Plaintiff names Khasiah Crawford ("Khasiah"), his minor child, as a co-plaintiff in this action. Record Document 1, p. 1. Defendants do not address her claims in their motions. However, because Khasiah asserts no claims independent of her father's claims, the Court will address her

claims now. As discussed in detail below, Khasiah's claims fail for both procedural and substantive reasons. Procedurally, Plaintiff has no standing to assert any claim on behalf of his illegitimate[19] daughter because he has failed to qualify as her tutor under state law. Substantively, Khasiah has no claims under § 1983 for acts committed against Plaintiff and her claims under state law are barred.

Procedurally, Plaintiff states that Khasiah "appears through her father, who is a person of the full age of majority and a resident of Louisiana," but fails to provide the Court with information to show that he is the proper party to represent Khasiah Crawford in a legal action under Louisiana law. *Id.* at ¶ 3. In Louisiana, unemancipated minors lack procedural capacity to sue and be sued except through a parent, tutor, or tutrix. *Nicosia v. Guillory*, 322 So. 2d 129, 131 (La. 1975). ("During tutorship, the tutor is the proper plaintiff to sue to enforce a right of the unemancipated minor."); La. Code Civ. Proc. art 683(C). If a child is born outside of marriage, the Louisiana Civil Code dictates that, "[t]he mother is of right the tutrix of her child born outside of marriage not acknowledged by the father, or acknowledged by him without her concurrence." La. Civ. Code art. 256(A). Plaintiff has not alleged that he was married to Khasiah's mother when she was born or that he has acknowledged her as his child, or any other facts that would show him to be her natural tutor. Plaintiff has not demonstrated that he is qualified to bring this lawsuit on her behalf. If this were the only defect in Khasiah's claims, her claims would be dismissed without prejudice, allowing a legally qualified person to assert her claims on her behalf. However, Khasiah's claims also lack substantive merit for the following reasons.

---

[19] Plaintiff's complaint states that he had Khasiah with a former girlfriend. Record Document 1, ¶ 57.

Substantively, Plaintiff's complaint is void of allegations that Defendants violated the constitutional rights of Khasiah Crawford, so she cannot assert any claims under § 1983. *Larpenter*, 369 F.3d at 482 (holding that to establish liability under § 1983, there must be a deprivation of a right secured by federal law). Therefore, none of Khasiah's federal law claims survive the instant motion to dismiss. As to Khasiah's state law claims, the reasons listed above and earlier in this ruling as to why Plaintiff cannot maintain those claims against Defendants also bar Khasiah's claims for recovery under those same torts. Thus, Khasiah's claims against Cox, Stewart, the Caddo Parish District Attorney's Office, Thoma, and the Caddo Parish Coroner's Office are **DISMISSED WITH PREJUDICE.**

## MOTION TO DISMISS PENALTY, PUNITIVE, OR EXMEPLARY DAMAGES

Defendants Thoma, Stewart, Cox, the Caddo Parish Coroner's Officer, and the Caddo Parish District Attorney's Office have filed a Motion to Dismiss Penalty, Punitive, or Exemplary Damages. [Record Document 15]. This motion is opposed. [Record Document 30]. In their motion, Defendants first argue that municipalities are immune from punitive damages under § 1983 and therefore any claim for punitive or exemplary damages against the Caddo Parish Coroner's Office or the Caddo Parish District Attorney's Office should be dismissed. Record Document 15-1, p. 3. Defendants argue that a finding of punitive damages against Thoma, Stewart, or Cox in their official capacities would be tantamount to a finding of punitive damages against the Caddo Parish Coroner's Office and/or the Caddo Parish District Attorney's Office and those claims should be dismissed as well. *Id.* at 4. Defendants also argue that Plaintiff has not alleged that Thoma, Stewart, or Cox acted in their individual capacities to violate Plaintiff's civil rights and therefore the only claims against them are claim for actions taken in their official capacities. *Id.* at 3. Plaintiff argues that he has asserted claims against Thoma, Stewart, and Cox in their individual capacities and that

federal law permits punitive damages awards against local officials sued in their individual capacities under § 1983. Record Document 30, pp. 4–5.

Defendants are correct in that an award of punitive damages against a municipality in a § 1983 suit is prohibited. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270–71 (1981). Furthermore, because an official capacity suit is to be treated as a suit against the entity, an award of punitive damages against Thoma, Stewart, and Cox in their official capacities is also prohibited. *Graham,* 473 U.S. at 166. Finally, Plaintiff's claims against Cox, Stewart, and Thoma in their individual capacities have been dismissed with prejudice. Therefore, Defendants' motion to dismiss penalty, punitive, or exemplary damages is **GRANTED.**

## CONCLUSION

For the reasons discussed above,

The Motion to Dismiss filed by Cox, Stewart, and the Caddo Parish District Attorney's Office [Record Document 16] is **GRANTED**. Plaintiff's claims against Cox, Stewart, and the Caddo Parish District Attorney's Office are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss filed by Thoma and the Caddo Parish Coroner's Office [Record Document 18] is **GRANTED**. Plaintiff's claims against Thoma and the Caddo Parish Coroner's Office are **DISMISSED WITH PREJUDICE**.

The Motion to Dismiss Penalty, Punitive, or Exemplary Damages filed by Cox, Stewart, the Caddo Parish District Attorney's Office, the Caddo Parish Coroner's Office, and Thoma [Record Document 15] is **GRANTED**.

Khasiah Crawford's claims against Cox, Stewart, the Caddo Parish District Attorney's Office, Thoma, and the Caddo Parish Coroner's Office are **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this _____ day of February, 2019.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE