| | |
|---|---|
| RODRICUS CRAWFORD | CIVIL ACTION NO. 17-01509 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| CADDO PARISH CORONER'S OFFICE, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Now before the Court is a Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for Failure to State a Claim Upon Which Relief Can Be Granted pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Defendant James Traylor ("Traylor"). [Record Document 26]. This motion is opposed. [Record Document 38]. For the reasons discussed below, the Motion to Dismiss pursuant to Rule 12(b)(1) is **DENIED** and the Motion to Dismiss pursuant to Rule 12(b)(6) is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

This case arises out of the arrest, prosecution, and conviction of Rodricus Crawford ("Plaintiff") for the murder of his son, Roderius Lott ("Roderius"). Roderius died on February 16, 2012. Record Document 1, ¶ 16. Authorities interrogated Plaintiff about Roderius's death and on February 24, 2012, he was arrested and subsequently charged with first degree murder. *Id.* at ¶ 38. Plaintiff was convicted of first degree murder on November 12, 2013, in the First Judicial District Court, Caddo Parish, and was sentenced to death on November 13, 2013. *Id.* at ¶ 75; *State v. Crawford*, 2014-KA-2153 (La. 11/16/16); 218 So. 3d 13. Defendant Dale Cox ("Cox") prosecuted

Plaintiff and was the acting District Attorney of Caddo Parish at the time. Record Document 1, ¶s 12 & 63. On November 6, 2016, the Louisiana Supreme Court reversed Plaintiff's conviction and remanded his case for a new trial. *Id.* at ¶ 75. He was released on November 22, 2016, after posting a $50,000 bond. *Id.* Defendant James Stewart ("Stewart"), the current District Attorney of Caddo Parish, dismissed the charges against Plaintiff on April 17, 2017. *Id.*

Plaintiff filed the instant lawsuit under Title 42 U.S.C. § 1983 on behalf of himself and his minor child Khasiah Crawford against the Caddo Parish Coroner's Office; Coroner Todd G. Thoma ("Thoma"); James Traylor, M.D. ("Traylor"); the Caddo Parish District Attorney's Office; James Stewart, Caddo Parish District Attorney; the Shreveport Fire Department; Sharon Sullivan; Daniel Mars; Dale Cox; ninety-nine "J. Does" that Plaintiff alleges work for Caddo Parish 911 or the Shreveport Police Department; and ten unnamed insurance companies. Record Document 1, p. 1. Plaintiff claims that his prosecution was illegally based on race and religion, and a complete indifference to the evidence. *Id.* According to Plaintiff, his prosecution and conviction were driven by Caddo Parish's well-known history of racism and the arbitrary application of the death penalty. *Id.* at 2. Plaintiff asserts that Defendants are liable to him under § 1983 for violations of his Sixth and Fourteenth Amendment rights, as well as the state law torts of intentional infliction of emotional distress and tortious interference with the parent-child relationship. *Id.* at ¶s 81–106. Finally, Plaintiff brings a direct action under state law against the insurance companies of Defendants. *Id.* at ¶ 108.

After filing this action, Plaintiff voluntarily dismissed his claims against Sharon Sullivan, Daniel Mars, and the City of Shreveport, improperly named as the Shreveport Fire Department. Record Document 42. Those parties were dismissed without prejudice and are no longer Defendants in this case. Record Document 47. In a previous ruling, the Court granted two motions

to dismiss pursuant to Rule 12(b)(6), one by filed Thoma and the Caddo Parish Coroner's Office and the other filed by Cox, Stewart, and the Caddo Parish District Attorney's Office. Record Document 48. Plaintiff's claims against those parties were dismissed with prejudice, and they are no longer Defendants in this case. *Id.* Traylor is the only named Defendant remaining in this case, and the instant ruling deals with his motions to dismiss pursuant to Rule 12(b)(1) and 12(b)(6).

The Court now turns to the facts giving rise to Plaintiff's alleged cause of action against Traylor. The sequence of events leading up to Traylor's involvement in the case are more fully set forth in the Court's previous ruling on this matter. *See id.* Traylor, a forensic pathologist, contracted with the Caddo Parish Coroner's Office to perform the autopsy of Roderius after Thoma had already examined his body at the emergency room and declared that the cause of death was suffocation from smothering. *Id.* at 4. Traylor incised the skin on Roderius's buttocks and scalp and found hemorrhages that were not visible to the naked eye. *Id.* He determined that the injuries were a result of child abuse and decided that, combined with the contusions on Roderius's lips, the death was "more likely than not" a smothering. *Id.* Traylor did not take tissue samples from the buttocks, scalp, or lips that would have revealed the timing of those injuries. *Id.* After announcing that the death was a homicide, Traylor discovered that Roderius had pneumonia in all five lobes of his lungs and that his blood culture tested positive for alpha hemolytic streptococcus bacteria, but Traylor did not order further testing to determine if the positive blood culture was the result of sepsis. *Id.* at 5. Plaintiff claims that Roderius died from a combination of the pneumonia in his lungs and septic shock caused when the bacteria entered his blood stream. *Id.* at 3; Record Document 1, ¶ 16.

## LAW AND ANALYSIS

Traylor is a forensic pathologist who contracted with the Caddo Parish Coroner's Office to perform autopsies and provide testimony in criminal trials. Record Document 1, ¶s 6 & 34. Plaintiff claims that, at all pertinent times, Traylor was acting under color of state law and is directly liable for the unconstitutional actions and state law torts listed in his complaint. *Id.* at ¶ 6. Plaintiff brings this § 1983 action against Traylor in his individual capacity. *Id.* Plaintiff contends that Traylor's actions deprived him of his right to a fair trial, of liberty without due process of law, and of equal protection under the law. Record Document 1, ¶s 83, 85, 91, & 93. In his motion to dismiss, Traylor argues that this Court does not have subject matter jurisdiction over Plaintiff's claims against him and that Plaintiff has failed to state a claim upon which relief can be granted. Record Document 26-1, pp. 8–9.

## I.  Motion to Dismiss pursuant to Rule 12(b)(1)

When a Rule 12(b)(1) motion is filed along with other Rule 12 motions, courts should first consider jurisdictional challenges raised by a defendant pursuant to Rule 12(b)(1) before addressing any claim against the merits of a complaint. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Accordingly, the Court will analyze Traylor's jurisdictional claims before addressing his Rule 12(b)(6) motion or any other alternative grounds for dismissal.

### A.  Legal Standard

Motions filed under Rule 12(b)(1) allow a defendant to challenge the subject matter jurisdiction of the court to hear a case. *Id.* If such jurisdiction is lacking, the case is properly dismissed. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). As the party asserting jurisdiction, the plaintiff bears the burden of proof that jurisdiction exists. *Ramming*, 281 F.3d at 161.

Federal court jurisdiction is limited by the Eleventh Amendment to the Constitution, which bars suits in federal court brought by a citizen against a state, unless the state consents to suit. U.S. Const. amend. XI; *Vogt v. Bd. of Comm'rs of the Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002) ("The 'ultimate guarantee of the Eleventh Amendment' . . . is that a non-consenting State may not be sued in federal court by private individuals, including its own citizens."). Louisiana does not consent to suit in federal court. La. R.S. § 5106(A); *Cozzo v. Tangipahoa Parish Council– President Gov't*, 279 F.3d 273, 281 (5th Cir. 2002). Eleventh Amendment sovereign immunity extends to entities that are considered an arm of the state. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997); *Vogt*, 294 F.3d at 689. A state agency is considered an arm of the state for Eleventh Amendment purposes. *Daigle v. Gulf State Utils. Co.*, 794 F.2d 974, 980 (5th Cir. 1986).

## B. Application

Traylor is not entitled to sovereign immunity for his role in Plaintiff's conviction. Traylor asserts that he is entitled to immunity under the Eleventh Amendment because he is a state official who is being sued in his official capacity, which constitutes a suit against the state itself. Record Document 26-1, p. 8 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Traylor asserts that he performed the autopsy in this case as an agent for the Coroner of Caddo Parish. *Id.* He claims that while performing the autopsy, he was considered a member of the judiciary under Louisiana law, just as the Coroner would be. *Id.* Traylor cites to *Sizemore v. West Jefferson Gen. Hosp.*, 260 So. 2d 800, 802 (La. App. 4 Cir. 1972) to support this proposition. *Sizemore* provides an overview of the duties of a coroner under Louisiana law. *Id.* It does not support the argument that a Coroner is a member of the judiciary. Traylor has provided the Court with no authority

showing that he was acting as a member of the judiciary when he performed the autopsy as an agent for the Coroner of Caddo Parish.

Furthermore, Plaintiff has sued Traylor in his individual capacity, not in his official capacity. Record Document 1, ¶ 6. Traylor does not acknowledge this discrepancy in his motion to dismiss. *See* Record Document 26-1, p. 8. Even though Plaintiff does not mention official capacity claims against Traylor in his complaint, Traylor states in his reply brief that Plaintiff brought claims against him in his individual capacity and as a state actor. Record Document 41, p. 1. Traylor asserts that "there is no factual allegation in the complaint showing any action by [himself] in his individual capacity that violated [Plaintiff's] constitutional rights." *Id.* at 2–3. Traylor argues that Plaintiff fails to state a claim against Traylor in his individual capacity because Plaintiff's complaint alleges that Traylor and other defendants were acting under color of state law. *Id.* at 3. Traylor appears to be arguing that state officials acting under color of law cannot be sued under § 1983 in their individual capacities. This logic contradicts the language of § 1983 itself, which provides a cause of action for those whose federal rights have been violated by a state actor operating "under color of state law," whether in an individual or official capacity. *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004). Sovereign immunity does not bar suits against a state officer in his individual capacity. *Alden v. Maine*, 527 U.S. 706, 757 (1999). Plaintiff's allegations against Traylor do not constitute claims against the state or an arm of the state, but are against Traylor as an individual. Therefore, Traylor is not entitled to Eleventh Amendment immunity from this lawsuit. Traylor's motion to dismiss pursuant to Rule 12(b)(1) is hereby **DENIED.**

## II. **Motion to Dismiss pursuant to Rule 12(b)(6)**

The Court will now evaluate Traylor's motion to dismiss for failure to state a claim upon which relied can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. **Legal Standard**

In order to survive a motion to dismiss brought under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The court must accept as true all of the factual allegations in the complaint in determining whether plaintiff has stated a plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). If a complaint cannot meet this standard, it may be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678–79. A court does not evaluate a plaintiff's likelihood for success, but instead determines whether plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). A dismissal under 12(b)(6) ends the case "at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

### B. **Plaintiff's claims against Traylor**

Plaintiff contends that Traylor violated § 1983 by denying him a fair trial [Record Document 1, ¶s 81–87], denying him liberty without due process of law [*Id.* at ¶s 88–91], and

denying him equal protection under the law [*Id.* at ¶s 92–94]. To establish liability under § 1983, there must be (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor. *Larpenter,* 369 F.3d at 482. Section 1983 is violated only when a person deprives another of a constitutional or statutory right under color of state law. 42 U.S.C. § 1983 (2012); *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). However, government officials who perform discretionary functions are shielded from liability under § 1983 if their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Plaintiff accuses Traylor of failing to follow routine and professional standards of practice for performing autopsies, making conclusions that are "wildly inconsistent with medical literature," operating under confirmation and actual bias, making false claims, and failing to preserve tissue samples. *See* Record Document 1. In his motion to dismiss, Traylor argues that he is entitled to absolute and/or qualified immunity from these assertions and that Plaintiff has failed to state any claims upon which relief can be granted. Record Document 26-1, p. 7. Plaintiff's accusations against Traylor can be grouped into several main categories as follows:

1. <u>Failure to date bruises found on the body</u>

During the autopsy, Traylor incised the skin on Roderius's buttocks and scalp to find hemorrhages that were not visible to the naked eye. Record Document 1, ¶ 34. Plaintiff alleges that these hemorrhages led Traylor to conclude that the injuries resulted from child abuse, and when combined with the contusions on Roderius's lips, that his death was "more likely than not" a smothering. *Id.* Traylor did not take tissue samples from those areas. *Id.* at ¶ 35. Plaintiff argues that taking such tissue samples is routine practice in autopsies and would have revealed the timing of the injuries. *Id.* Plaintiff further argues that Traylor's assertion that there is no accurate way to

date a bruise by microscopic examination is "flatly contradicted by medical science." *Id.* at ¶s 52–53. Plaintiff alleges that Traylor falsely claimed that Roderius's death was a homicide because of the presence and pattern of injuries on his lips. *Id.* at ¶ 52.

2. Conclusions about bacteria in lungs and failure to order necessary lab tests

Traylor announced that Roderius's death was a homicide before receiving the results from a blood culture sample of Roderius's lungs. *Id.* at ¶ 36. He maintained that the death was a homicide even when he discovered pneumonia in all five lobes of the lungs, with edema, necrosis of the lung tissue, and hemorrhaging. *Id.* The blood culture tested positive for alpha hemolytic streptococcus bacteria, but Traylor did not order further tests to determine if the positive blood culture was the result of sepsis.[1] *Id.*

Plaintiff argues that Traylor falsely stated that the lab technician told him that the strain of bacteria in Roderius's lungs could not be identified as streptococcus pneumonia. *Id.* at ¶ 44. However, Plaintiff asserts that the lab report states that the tests necessary to identify streptococcus pneumonia were not performed. *Id.* at ¶s 44–46. Therefore, Plaintiff argues that Traylor had no basis for concluding that Roderius was not infected with streptococcus pneumonia and that the death was a homicide. *Id.* at ¶ 46. After discovering the presence of bacteria in Roderius's blood, Traylor stated that it could have come from contact with a contaminated needle or Roderius's own skin. *Id.* at ¶ 47. Plaintiff argues that medical literature establishes that the odds of testing positive for alpha hemolytic streptococci as a result of contamination are "almost non-existent." *Id.* Finally, Plaintiff states that Traylor's failure to order a lab culture of the infected tissue in Roderius's lungs was contrary to the protocol of the National Association of Medical Examiners. *Id.* at ¶ 48.

---

[1] Plaintiff alleges that Roderius's cause of death was sepsis due to bacterial purulent pneumonia with abscess formation. Record Document 1, ¶ 18.

9

### 3. Conclusions regarding Roderius's pneumonia

At trial, Traylor testified that Roderius was immunized against pneumonia and that the "vaccine would have had to have been bad" in order for him to succumb to complications of pneumonia. *Id.* at ¶ 49. Plaintiff counters that Roderius had only received one dose of the three-dose Prevnar-13 vaccine schedule and that no medical literature establishes that this would cause Roderius to be immunized against pneumonia. *Id.* at ¶s 49–50. Traylor also testified that the pneumonia in Roderius's lung tissue was "early" because it was in his bronchial tubes and had not consolidated in the lobes of his lungs. *Id.* at ¶ 51. Plaintiff disagrees with this conclusion, arguing that bronchial pneumonia is more common in the very young than lobar pneumonia and that it can cause sepsis in infants. *Id.* Plaintiff argues that the lack of consolidation in the lobes of Roderius's lungs does not mean that the bronchial pneumonia was not severe. *Id.*

### 4. Conclusions regarding cerebral edema

According to Plaintiff, Traylor's autopsy report stated that Roderius's death was a homicide based on a finding of cerebral edema without herniation, which he claimed is a side effect of suffocation. *Id.* at ¶ 37. Plaintiff avers that this assertion is "wildly inconsistent" with medical literature and that cerebral edema is not a side effect of suffocation. *Id.*

### 5. Bias

Plaintiff alleges that Traylor was operating under "confirmation bias" because he began his investigation with preconceived theories and focused on evidence that supported theories to which he had already ascribed. *Id.* at ¶ 40. According to Plaintiff, accepted procedures in the field of forensic medicine require a forensic scientist to approach an investigation with no preconceived ideas and to reserve judgment until all of the evidence has been gathered. *Id.* at ¶s 40 & 42. Plaintiff argues that Traylor operated with deliberate indifference to those professional standards of

practice. *Id.* at ¶ 40. Plaintiff also states that Traylor admitted to actual bias when he stated that he conducted the autopsy with the idea that he needed to exclude homicide as a cause of death. *Id.* at ¶ 41.

### 6. Failure to preserve tissue samples

Plaintiff alleges that Traylor failed to preserve tissue samples and that this prevented Plaintiff from being able to conduct independent testing and prove that the injury occurred hours or days before his death instead of at the time of death. *Id.* at ¶ 54. Plaintiff argues that this failure to preserve samples represents a fundamental violation of the standard protocol in post-mortem examinations, especially in pediatric post-mortems. *Id.*

### 7. Traylor's testimony at trial

Plaintiff states that law enforcement relied almost exclusively on the opinions of Thoma and Traylor during the investigation and prosecution. *Id.* at ¶ 39. When Plaintiff told officers that he did not hit, abuse, or kill his son, the arresting officer told Plaintiff that his statement was inconsistent with the coroner's finding that Roderius had been suffocated. *Id.* Plaintiff asserts that Traylor's testimony at trial was the only evidence presented by the state that Plaintiff had an intent to kill Roderius. *Id.* at ¶ 55. Traylor testified that he was sure someone smothered the baby and that he was the "only voice for the victim." *Id.* at ¶ 56.

## C. Absolute Immunity

### 1. Absolute immunity for trial testimony

Traylor argues that he is entitled to absolute or qualified immunity from all of the above claims. He appears to conflate the two concepts, at one point stating that he is "entitled to immunity based upon his performance of such official duties" without specifying whether he is referring to absolute or qualified immunity. Record Document 26-1, p. 11. Traylor explicitly argues, and

Plaintiff admits, that he is entitled to absolute immunity for his testimony during Plaintiff's trial. *Id*; Record Document 38, p. 5 n.15. Traylor is correct; he is absolutely immune from Plaintiff's allegations regarding any statements he made during trial, including his statement that he was the only voice for the victim. *Briscoe v. LaHue*, 460 U.S. 325, 345 (1983); *see* Record Document 1, ¶ 56.

In *Briscoe v. LaHue*, the Supreme Court held that the same rationale that established absolute immunity for judges and prosecutors applies to trial witnesses. 460 U.S. at 345. The Court found that there was no evidence that the drafters of the statute that became § 1983 intended it to abrogate witness immunity found at common law. *Id.* at 339. The Fifth Circuit has also recognized the "well-established" rule that witnesses have absolute immunity for their testimony at trial. *Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003). Plaintiff's claims against Traylor for his testimony at Plaintiff's criminal trial are hereby **DISMISSED WITH PREJUDICE**. The Court notes that although Traylor is absolutely immune from liability for his trial testimony, this absolute immunity does not provide him with protection from liability for his pre-testimonial investigative activities. *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003).

## 2. Absolute immunity for all other claims

To the extent that Traylor attempts to argue that he is absolutely immune from the remainder of Plaintiff's allegations, he is not entitled to such immunity. Traylor states that, "[a] government official is entitled to absolute immunity for any type of remedy in a suit by a person who claims that Federal rights have been violated." Record Document 26-1, p. 10. This statement is inherently untrue and again contradicts the language of § 1983 itself. *See* 42 U.S.C. § 1983 (providing a cause of action for those whose federal rights have been violated by a state actor operating under color of state law). Traylor references the absolute immunity that applies to

12

witnesses, judges, legislators, and prosecutors in his motion to dismiss, but fails to provide any legal authority showing that he is entitled to absolute immunity for his status as a private forensic pathologist who contracted with the Coroner's Office to perform an autopsy. Record Document 26-1, pp. 10–12. This Court finds no grounds for extending absolute immunity to Traylor for his actions on behalf of the Coroner's Office in this case. *See Butz v. Economou,* 438 U.S. 478, 507 (1978) (stating that absolute immunity is reserved for "exceptional situations."); *Forrester v. White,* 484 U.S. 219, 224 (1988) (noting that the Supreme Court has generally been "quite sparing" in its recognition of claims to absolute official immunity). As such, Traylor is not entitled to absolute immunity from Plaintiff's assertions regarding his autopsy of Roderius's body.

### D. Qualified Immunity

Traylor also raises qualified immunity as a defense to Plaintiff's § 1983 claims against him in his individual capacity. Record Document 26-1, p. 12. It is well established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Although Traylor is a private physician who contracted with the Caddo Parish Coroner's Office to perform Roderius's autopsy, he is still entitled to assert qualified immunity. *See Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir. 2017) (stating that defendants who were forensic consultants in a criminal investigation were entitled to assert qualified immunity). Plaintiff argues that Traylor is not entitled to qualified immunity because Plaintiff's constitutional rights to a fair trial, equal protection, and due process are well-established. Record Document 38, p. 7.

1. Qualified immunity standard

Once qualified immunity has been raised by a defendant, the burden is then upon the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Id.* Accordingly, the issue of whether qualified immunity applies should be resolved at the earliest possible stage in the litigation. *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). Resolving the issue early serves to protect officials from unwarranted liability and "costly, time-consuming, and intrusive" pre-trial discovery. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

The defense of qualified immunity involves a two-part inquiry: (1) whether the facts alleged or shown by the plaintiff demonstrate a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Harlow*, 457 U.S. at 818. "The constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right." *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998). A public official may assert the defense of qualified immunity even though a plaintiff's civil rights have been violated, provided that the official's conduct was objectively reasonable. *Id.* at 467. The standard of "objective reasonableness" ensures that officers are on notice that their conduct is unlawful before they are subjected to a lawsuit. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Whether the actions of the official are objectively reasonable turns on the circumstances confronting the official as well as "clearly established law" in effect at the time of the official's conduct. *Id.* at 243. "The subjective intent of the officer is irrelevant, and the officer's knowledge of the law need not rise to the level of a 'constitutional scholar.'" *Sanchez*, 139 F.3d at 467 (citing

*Harlow*, 457 U.S. at 815–17). A court may begin its analysis of qualified immunity with either prong. *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014).

2. Application of qualified immunity standard

The Court finds that a dismissal of Plaintiff's claims against Traylor based on qualified immunity is not appropriate at this stage in the litigation. As more fully discussed below, a government official who merely performs a negligent autopsy is entitled to qualified immunity, but an official who creates a "misleading or scientifically inaccurate" report violates a criminal defendant's due process right to be free from false or fabricated evidence. *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008). The Court finds that Plaintiff, at this stage of the proceedings, has provided enough facts to state a plausible claim that the autopsy report Traylor prepared was misleading and scientifically inaccurate, in violation of Plaintiff's due process rights that were well-established when the violation occurred. The Court also finds that Plaintiff is not entitled to relief for his allegation that Traylor violated his due process rights by failing to preserve tissue samples, which will be addressed first.

a. *Failure to preserve tissue samples*

Plaintiff alleges that Traylor failed to preserve tissue samples from Roderius's body in violation of the standard protocol in pediatric post-mortems. Record Document 1, ¶ 54. According to Plaintiff, this failure to preserve the tissue samples violated his right to due process because he was unable to conduct independent testing and "prove that the injury occurred hours or days before [Roderius's] death, and not at the time of death." *Id.* If Plaintiff's assertions are true, Traylor's failure to preserve potentially helpful evidence was certainly unfortunate for Plaintiff. However, Plaintiff provides no factual details regarding this assertion that could allow the Court to draw a reasonable inference that Traylor is liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678.

Furthermore, Plaintiff provides the Court with no statutes or jurisprudence showing that a person conducting an autopsy has an affirmative duty to preserve tissue samples or that he possessed a clearly established due process right to have these tissue samples preserved in his criminal case. Nor can the Court find any authority supporting his assertions in this area.

In *Arizona v. Youngblood*, the Supreme Court held that the failure to preserve potentially useful evidence did not constitute a denial of due process where the criminal defendant could not show bad faith on the part of the police. 488 U.S. 51, 58 (1988). The Court found that bad faith should be required to prove a due process violation when the state fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. This is exactly the type of evidence Plaintiff accuses Traylor of failing to preserve. Plaintiff has not alleged that Traylor, acting on behalf of the state, failed to preserve the tissue samples in bad faith. Therefore, he has not alleged a due process violation. Plaintiff's claim against Traylor for his alleged failure to preserve tissue samples is **DISMISSED WITH PREJUDICE**.

> b. *Autopsy and Autopsy Report*

The majority of Plaintiff's allegations against Traylor are based on the autopsy he performed on Roderius's body and the conclusions he drew from that autopsy. Plaintiff states that Traylor's biases led him to believe that Roderius's death was a homicide before he began the autopsy and that these biases prevented him from conducting the autopsy in a scientifically sound manner. Record Document 1, ¶s 40 & 42. To support this argument, Plaintiff points to several errors he asserts that Traylor made during the autopsy. These errors, outlined in more detail earlier in this ruling, include failing to order tests or take tissue samples that would have provided more information about the cause and timing of death (*Id.* at ¶s 35–36), making claims and drawing

conclusions that were not supported by medical science (*Id.* at ¶s 37, 46–47, & 49–51), and failing to follow professional standards of practice (*Id.* at ¶s 41–42, 48, & 54). To evaluate whether Traylor is shielded from liability for these actions under the doctrine of qualified immunity, the Court must evaluate 1) whether the facts alleged by Plaintiff show that Traylor violated his constitutional rights and 2) whether those rights were clearly established at the time of the alleged misconduct. *Harlow*, 457 U.S. at 818.

<em>i.   Plaintiff has no right to be free from a negligently performed autopsy</em>

Coroners generally enjoy qualified immunity when acting within the scope of their duties. *Lawyer v. Kernodle*, 721 F.2d 632, 635 (8th Cir. 1983). Even a coroner who performs a negligent autopsy does not violate a criminal defendant's clearly established constitutional rights. *Id.* at 636; *Galbraith v. Cty. of Santa Clara*, 99-20887 SW, 2000 WL 1793164 at *2 (N.D. Cal. July 19, 2000), *rev'd on other grounds*, 307 F.3d 1119 (9th Cir. 2002). Plaintiff has failed to provide the Court with any authority showing that a criminal defendant's right to a non-negligently performed autopsy is clearly established under federal law. *Galbraith*, 2001 WL 1793164 at *2.

In addition, the Fifth Circuit has held that negligent forensic work in a criminal case will not defeat a claim of qualified immunity. *Brewer*, 860 F.3d at 825. In *Brewer v. Hayne*, the Fifth Circuit upheld a grant of summary judgment in favor of two forensic consultants who provided information in the plaintiffs' criminal investigations that was later revealed to be baseless. *Id.* Defendants Hayne, a private pathologist who performed autopsies for the State of Mississippi, and West, a dentist and forensic odontologist with whom Hayne consulted, concluded in two separate murder investigations that bite marks found on the bodies of the victims matched teeth patterns attributable to the plaintiffs. *Id.* at 821–22. The plaintiffs, Brewer and Brooks, were convicted of

murder but their convictions were later vacated based on new evidence. *Id.* Brewer and Brooks sued Hayne and West under § 1983. *Id.* at 821.

The Fifth Circuit found that the plaintiffs presented sufficient evidence to show that the defendants were negligent in their forensic analysis but had not shown that the defendants had an intent to fabricate evidence, which would constitute a due process violation. *Id.* at 825. The court held that negligence alone would not defeat qualified immunity and that Hayne and West were entitled to qualified immunity for their potentially negligent and inaccurate medical conclusions. *Id.* Thus, to the extent that Plaintiff seeks to impose liability on Traylor for a merely negligent autopsy, qualified immunity prevents him from doing so.

> ii.  *Plaintiff has a right to be free from the deliberate or knowing creation of misleading and scientifically inaccurate evidence*

In his opposition to the motion to dismiss, Plaintiff alleges that Traylor violated his due process right to be free from fabricated evidence. Record Document 38, p. 7. Plaintiff then reiterates his assertions that Traylor approached Roderius's autopsy with preconceived theories based on race and racism, that he ignored medical science, and that the autopsy constituted manufactured evidence. *Id.* at 8. Plaintiff references the Fifth Circuit's decision in *Castellano v. Fragozo*, 352 F.3d at 959–60, to support his allegation that Traylor violated his constitutional rights. *Id.* In *Castellano*, the Fifth Circuit acknowledged that a state violates a criminal defendant's right to a fair trial when it manufactures evidence and knowingly uses that evidence, along with perjured testimony, to obtain a wrongful conviction. 352 F.3d at 942. The court stated, "the heart of Castellano's claim is that the prosecution obtained his arrest and conviction by use of manufactured evidence and perjured testimony." *Id.* at 959–60. Plaintiff avers that this statement reflects the heart of his claim as well. Record Document 38, p. 8.

In *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008), the Fifth Circuit held that a criminal defendant had a due process right to be free from "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report." Brown was exonerated through DNA evidence twenty years after he was convicted of rape and sentenced to life in prison. *Id.* at 234. Brown then sued the city of Covington, Louisiana, and several of its officers for alleged misconduct during the investigation and prosecution of his criminal case. *Id.* Miller, a laboratory technician, had performed a test on blood samples collected from Brown and compared the antigens in Brown's blood with the antigens found in a mixture of blood and semen taken from the minipad and underwear of the victim. *Id.* Miller alleged that the results of this test were sufficient to identify Brown as the rapist and subsequently gave "verbal confirmation" of a positive match to a police officer. *Id.* at 235. This verbal confirmation led to Brown's arrest. *Id.* Miller later produced a written report containing conclusions that Brown claimed to be scientifically inaccurate. *Id.* The minipad was re-tested in 2003 and it was revealed that Brown could not have been the donor of the semen. *Id.*

Brown filed a § 1983 suit, arguing, among other things, that Miller deprived him of his right to a fair trial and due process of law. *Id.* Brown alleged that Miller either 1) intentionally failed to conduct additional, commonly used tests that would have made the identification more specific and accurate and would have likely excluded Brown as the donor, or 2) conducted those tests and concealed the exculpatory results. *Id.* Brown alleged that Miller's report did not have any scientific basis, that he grossly overstated the laboratory results, violated standard procedures for analyzing blood-semen stains, and that all of these combined to create a "misleading and materially inaccurate inculpatory serology report." *Id.* at 237.

The Fifth Circuit found that the district court did not err in denying Miller's motion to dismiss based on qualified immunity. *Id.* at 238. The court stated that "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights." *Id.* at 237. While the direct holding of *Brown* references actions that are deliberate or knowing, the rest of the opinion is unclear about the extent to which the creation of false evidence must be intentional to constitute a due process violation. The court compared Brown's claims that Miller knew he should have reported that the lab results were inconclusive to the violation of due process rights that occurs when the government obtains a conviction with perjured testimony. *Id.* The court found that "a false or scientifically inaccurate report is equivalent to any other type of false evidence created by investigators." *Id.* The court also stated that "the right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier." *Id.* This Court finds that in the instant case, Plaintiff possessed a due process right to be free from "the deliberate or knowing creation" of "misleading and scientifically inaccurate" evidence and that a reasonable forensic pathologist performing an autopsy for the state in 2016 would have been aware of such a right. *See id.* The Court must now determine whether Plaintiff has stated a plausible claim that Traylor violated his right to be free from such evidence.

    *iii.*     *Recent jurisprudence on the right to be free from false or scientifically inaccurate evidence*

The Fifth Circuit's recent treatment of a defendant's right to be free from the deliberate or knowing use of misleading and scientifically inaccurate evidence is helpful in determining whether Plaintiff has provided enough facts to survive a motion to dismiss. Nine years after *Brown*, the Fifth Circuit declined to reach the same result in *Hill v. Gressert*, 705 Fed. Appx. 219, 222 (5th Cir. 2017). In *Hill*, a defendant who was convicted of rape and later exonerated sued the law

enforcement officers who handled his criminal investigation. *Id.* at 220. One of the defendants to Hill's suit was Waguespack, a criminalist who tested the rape victim's underwear for semen, hair, and blood, which he reported were not present. *Id.* Thirteen years later, DNA testing of semen taken from the underwear established Hill's innocence. *Id.* Hill alleged that Waguespack either 1) knowingly or recklessly failed to conduct serological testing on the underwear to detect the presence of seminal fluid and then falsely reported that no seminal fluid was present or 2) conducted such testing and misreported the results. *Id.* at 221. At oral argument, Hill pointed to *Brown v. Miller* as providing the "clearly established law" for his case. *Id.* at 222. The Fifth Circuit, however, distinguished its holding in *Brown* from Hill's case. *Id.* The court found that unlike the present case, the defendants in *Brown* had a known suspect in mind, tested the victim's DNA samples against the suspect's samples, found the results either exculpatory or inconclusive, and then lied and claimed the results were a match. *Id.* The court stated that *Brown* was "quite a distance from even the worst of the allegations against Waguespack." *Id.* The Fifth Circuit held that the failure to test for the presence of semen did not violate Hill's clearly established constitutional rights and therefore Waguespack was entitled to qualified immunity. *Id.*

In *Dean v. Harris Cty.*, H-13-00073, 2013 WL 5214351 at *7 (S.D. Tex. Sept. 17, 2013), a Southern District of Texas district court found that the plaintiff had presented well-pleaded facts to support a claim of falsification of evidence. In that case, the plaintiff, Dean, was tried twice for the murder of his wife, but the murder charges were dismissed during his second trial. *Id.* at *3. Dean filed a § 1983 suit that included allegations that Phatak, who performed the autopsy of Dean's wife, falsified the autopsy report, intentionally allowed one of the police officers investigating the case to bias the autopsy and death investigation, and prematurely eliminated a manner-of-death classification. *Id.* Dean alleged that Phatak's actions contributed to his indictment and murder

21

trials, in violation of his due process rights. *Id.* Dean's specific allegations were that a police officer who was investigating the case attended the victim's autopsy and shared his beliefs regarding her cause of death, including his belief that Dean killed her, which influenced Phatak's conclusions. *Id.* at *2. Dean also alleged that Phatak allowed the officer to examine the gunshot wound and determine the cause of an imprint near the gunshot wound. *Id.* Dean asserted that Phatak falsified his autopsy report to categorize the victim's death as a homicide. *Id.* Phatak filed a motion to dismiss, arguing that Dean merely alleged that he "negligently conducted an improper death investigation," which did not violate Dean's due process rights. *Id.* at *3. The district court found that Dean presented several well-pleaded allegations that went beyond legal conclusions showing that his due process right to be free from false evidence was violated. *Id.* at *7. The court denied Phatak's motion to dismiss Dean's suit. *Id.* at *8. Dean's allegations in this matter included claims that Phatak disregarded a significant amount of evidence that indicated the victim had committed suicide. *Id.* at *6. These allegations are similar to Plaintiff's claims that Traylor ignored signs that Roderius died of sepsis and falsely categorized his cause of death as a homicide based on his biases.

      iv.     <u>*Dismissal of Plaintiff's autopsy-related claims is not warranted at this stage*</u>

The limited jurisprudence located by the Court leaves unanswered several questions as to whether qualified immunity applies to the actions of Traylor as alleged by Plaintiff. First, the jurisprudence located by the Court is unclear as to whether deceitful intent by the defendant is necessary to constitute a due process violation. The parties have not briefed this issue. Second, the jurisprudence is unclear as to whether that intent is judged on a subjective or objective basis. Stated another way, is it necessary that the defendant has the actual intent to put forth false evidence or

would a reckless disregard for the accepted scientific method be sufficient to prove that intent? The parties have not briefed this issue either.

The case law examined by the Court answers these two questions only with an illustrative spectrum of actions by the different defendants. On one end of the spectrum is forensic work that is merely negligent, which the Fifth Circuit has established is covered by qualified immunity. *See Brewer,* 860 F.3d at 825; *Hill*, 705 Fed. Appx. at 222. On the other end of the spectrum is the intentional fabrication or manufacture of false evidence through forensic work, which is a clear due process violation. *Castellano*, 352 F.3d at 942 ("We hold that a state's manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause . . . ."). The right of a criminal defendant to be free from "the deliberate or knowing creation" of "misleading and scientifically inaccurate" evidence, as established in *Brown*, exists somewhere in between the two ends of this spectrum. *Brown*, 519 F.3d at 237. In other words, *Castellano* involved the creation of "evidence" from whole cloth, whereas forensic evidence actually existed in *Brown*, but the defendant reported misleading and unsupported results of the tests he performed. The case law on this issue does not establish, nor can this Court determine, a clear dividing line between what conduct would and would not constitute a due process violation on the part of a state employee performing forensic work in a criminal case.

As discussed above, a key question in determining whether a defendant's actions constitute a due process violation is whether the Court examines the actions of the person performing the forensic work from a subjective or objective standard. Again, the case law does not answer this question directly but instead provides only an illustrative spectrum of actions by different defendants. *Brown* suggests that a state actor could deliberately or knowingly create "misleading

and scientifically inaccurate" evidence by performing forensic work in a manner she must have known to be incorrect, substandard, or grossly negligent and drawing conclusions that are not supported. *See id. Brown* found that the defendant was not entitled to qualified immunity from the plaintiff's claim that he "overstated the results of the blood tests he conducted, effectively fabricating evidence by overstating his results and putting forward misleading scientific conclusions." *Id.* In *Brewer*, on the other hand, the Fifth Circuit held that no constitutional violation occurred because the plaintiffs' evidence was not suggestive of "an intention to fabricate." 860 F.3d at 825. The court found that the plaintiffs' evidence showed that the defendants "were mistaken in their conclusions or methodologies, but no more." *Id.* These holdings suggest that it is the actor's mindset or intent that determines whether a due process right has been violated. How the intent of the actor is proven in cases such as the one at hand is unresolved.

At this stage, the Court lacks sufficient information to determine where Plaintiff's allegations fall on this spectrum and whether his due process rights were violated by Traylor's actions. This uncertainty is compounded by the failure of both parties to sufficiently address these issues in their briefs. Some of Plaintiff's allegations accuse Traylor of reaching conclusions that Traylor knew to be false. *See* Record Document 1, ¶s 37, 44, 47, 49, & 51. Plaintiff makes other allegations that Traylor performed an incompetent autopsy and failed to follow basic procedures for autopsies such that his actions were obviously deficient as to scientific methodology. *See id.* at ¶s 35, 36, & 48. Thus, Plaintiff seems to argue that some of Traylor's expressed opinions were subjectively false, while others were objectively false. Yet, Traylor's motion to dismiss does not devote much space to addressing Plaintiff's claims about the autopsy and autopsy report. Traylor cites *Brewer* for the proposition that negligence alone cannot defeat qualified immunity and states, "allegations that the Plaintiff's expert pathologist disagreed with the opinions of Dr. Traylor does

not lead to an inference of intentional fabrication." Record Document 26, p. 12. Traylor does not respond to any of Plaintiff's specific allegations regarding the autopsy or autopsy report. This portion of the brief also contains a confusingly incomplete sentence that states, "the allegations contained in this [c]omplaint regarding the report and testimony of Dr. Traylor are based on, rather than specific facts that would give an inference of intentional fabrication." *Id.* This incomplete sentence leaves the Court to guess upon what Traylor alleges Plaintiff's assertions are based, an important piece of Traylor's defense. Plaintiff's opposition to the motion to dismiss fares no better. Plaintiff provides little to no argument establishing why he should be allowed to maintain his claim that Traylor fabricated evidence that was used against him except to say that such a right exists and that Traylor violated it through the autopsy. Record Document 38, p. 7. Despite the shortcomings in Plaintiff's brief, the Court will not dismiss his claims against Traylor at this time.

The Court finds that Plaintiff has sufficiently alleged facts that, taken in the light most favorable to him, establish a plausible claim that Traylor deliberately or knowingly created "misleading and scientifically inaccurate" evidence when he performed the autopsy of Roderius's body and prepared the autopsy report. *Brown*, 519 F.3d at 237. If all of Plaintiff's allegations are true, Traylor knew that the manner in which he performed the autopsy was deficient and that the autopsy report was "misleading and scientifically inaccurate" evidence, which could establish a due process violation. *See id.* Therefore, the Court finds a dismissal under Rule 12(b)(6) to be inappropriate at this stage of the litigation, and Traylor's motion is **DENIED** as to Plaintiff's claims regarding the autopsy and autopsy report.

### E. State Law Claims

Plaintiff brings state tort claims for intentional infliction of emotional distress and tortious interference in a parent-child relationship against all Defendants, including Traylor. Record

Document 1, ¶s 103–106. Plaintiff fails to identify which actions by Defendants gave rise to these allegations and instead states that "Defendants, by their extreme and outrageous conduct, intentionally or recklessly caused emotional distress to Plaintiffs" and that "[a]s a result [of Defendants' actions], Plaintiffs suffered the loss of the ability to function in a normal, mutually supportive parent-child relationship with each other." *Id.* at ¶s 104 & 106.

1. <u>Intentional Infliction of Emotional Distress</u>

Because Plaintiff fails to identify any specific actions taken by Traylor that gave rise to this tort, the Court is required to evaluate whether any of Traylor's actions in this case could support such a claim. In order to recover for intentional infliction of emotional distress in Louisiana, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Sabre Indus., Inc. v. Module X Sols., LLC*, 15-2501, 2017 WL 4183070, at *3 (W.D. La. Sept. 19, 2017) (quoting *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991)). The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . ." *Id.* The Court finds that none of Plaintiff's allegations against Traylor can support a claim for intentional infliction of emotional distress, except for Plaintiff's contentions regarding the autopsy and autopsy report.

Louisiana law provides coroners and their support staff[2] with limited statutory immunity:

I. (1) Liability shall not be imposed on an elected coroner or his support staff based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

---

[2] The Court considers Traylor to be a part of the Coroner's support staff that is entitled to this immunity.

(2) The provisions of Paragraph (1) of this Subsection are not applicable to any of the following:

    (a) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

    (b) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

(3) The legislature finds and states that the purpose of this Subsection is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.

La. Stat. Ann § 13:5713(I).

The law requires a coroner to view a body or conduct an investigation in cases involving, *inter alia*, "[s]uspicious, unexpected, or unusual deaths[,] . . . [d]eaths due to unknown or obscure causes or in any unusual manner[,] . . . [d]eaths due to a suspected suicide or homicide[,] . . . [and] [d]eaths due to . . . suffocation[] or smothering." *Id.* at § 13:5713(A)(1), (3), (5), & (9). When there is a "reasonable probability that the violation of a criminal statute has contributed to the death," a coroner must perform an autopsy. *Id.* at § 13:5713(B)(1). However, the immunity does not apply to "acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." *Id.* at § 13:5713(I)(2)(b).

The Court finds that Plaintiff's intentional infliction of emotional distress claim should survive the instant motion to dismiss because the same facts provided by Plaintiff establishing a plausible claim that Traylor intentionally created misleading or scientifically inaccurate evidence also establish a plausible claim that Traylor committed "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct" during his investigation into Roderius's death. *Id.* If Traylor did commit such misconduct, such actions would fall outside of the scope of the immunity for coroners found in § 13:5713(I). Furthermore, such misconduct could meet the elements of an action for intentional infliction of emotional distress. The Court finds it

inappropriate to dismiss this cause of action at this stage. Traylor's motion to dismiss is therefore **DENIED** as to Plaintiff's claim for intentional infliction of emotional distress regarding the autopsy and autopsy report.

   2.  Tortious Interference with the Parent-Child Relationship

Plaintiff asserts a claim of tortious interference with the parent-child relationship against all Defendants, including Traylor. Record Document 1, ¶s 105–106. This cause of action fails because "tortious interference with the parent-child relationship" is not recognized as a tort in Louisiana jurisprudence. At least one Louisiana court has considered issues relating to interference in a parent-child relationship in the context of family law and custody disputes, but not in a tort context. *See Pulley v. Pulley*, 587 So. 2d 116, 120 (La. App. 2 Cir. 1991). Because he does not allege a tort recognized under Louisiana law, Plaintiff's claim against Traylor for tortious interference with the parent-child relationship is **DISMISSED WITH PREJUDICE.**

**F.  Khasiah Crawford's Claims**

Plaintiff also named Khasiah Crawford ("Khasiah"), his minor child, as a plaintiff in this action. Record Document 1, p. 1. Traylor does not address her claims in his motion to dismiss. However, because Khasiah asserts no causes of action independent of her father's causes of action, the Court will address them now. As explained in the Court's previous ruling, Khasiah is not a proper plaintiff to this case. *See* Record Document 48, pp. 42–44. Khasiah's action fails for both procedural and substantive reasons. Procedurally, Plaintiff has no standing to assert any legal action on behalf of his illegitimate[3] daughter because he has failed to qualify as her tutor under state law. *Id.* at 43. Substantively, Khasiah's allegations cannot survive under § 1983 or under state

---

[3] Plaintiff's complaint states that he had Khasiah with a former girlfriend. Record Document 1, ¶ 57.

tort law because the alleged acts were committed against Plaintiff Rodricus Crawford, not Khasiah Crawford. Plaintiff does not allege that Defendants violated the constitutional rights of Khasiah, so she cannot assert any action under § 1983. *Larpenter*, 369 F.3d at 482 (holding that to establish liability under § 1983, there must be a deprivation of a right secured by federal law). Therefore, Khasiah's § 1983 action cannot survive the instant motion to dismiss.

As to Khasiah's state law actions, the reasons listed above as to why Plaintiff cannot maintain his cause of action for tortious interference with the parent-child relationship against Traylor also prevents Khasiah from maintaining the same action. Neither can Khasiah assert a claim of intentional infliction of emotional distress against Traylor. The facts set forth in the complaint do not establish that Khasiah suffered "severe emotional distress" that could meet the elements of such a claim under Louisiana jurisprudence. *See White*, 585 So. 2d at 1209. The only reference the complaint makes to Khasiah's emotional state is to say that she and Plaintiff "suffered the loss of the ability to function in a normal, mutually supportive parent-child relationship with each other." Record Document 1, ¶ 106. The Court does not doubt that her father's incarceration affected Khasiah emotionally. Yet, the complaint does not supply facts that, if true, would support this cause of action. There are no facts showing that any of Traylor's conduct was directed towards Khasiah or that Traylor intended such conduct to cause her any emotional distress. *White*, 585 So. 2d at 1209. Khasiah's intentional infliction of emotional distress claim against Traylor cannot survive the instant motion to dismiss. Therefore, all of Khasiah's claims against Traylor are **DISMISSED WITH PREJUDICE**.

## CONCLUSION

For the reasons discussed above,

The Motion to Dismiss filed by Traylor [Record Document 26] is hereby **DENIED** as to Rule 12(b)(1) for lack of subject matter jurisdiction and hereby **GRANTED IN PART** and **DENIED IN PART** as to Rule 12(b)(6) for failure to state a claim. Plaintiff's claims against Traylor relating to his testimony at trial, his failure to preserve tissue samples, and his alleged tortious interference in the parent-child relationship are hereby **DISMISSED WITH PREJUDICE**. As to the remainder of Plaintiff's claims against Traylor, including his claim of intentional infliction of emotional distress, Traylor's motion to dismiss is hereby **DENIED** at this juncture.

All of Khasiah Crawford's claims against Traylor are hereby **DISMISSED WITH PREJUDICE**.

The Court will issue a separate minute entry setting a status conference with the remaining parties to determine how best to proceed with the resolution of Plaintiff's remaining claims.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 29th day of March, 2019.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE